392 F.Supp. 1362 (1975)
PLANNED PARENTHOOD OF CENTRAL MISSOURI, a Missouri Corporation, et al., Plaintiffs,
v.
John C. DANFORTH, Attorney General of the State of Missouri, and J. Brendan Ryan, Circuit Attorney of the City of St. Louis, Missouri, Defendants.
No. 74-416C (A).
United States District Court, E. D. Missouri, E. D.
January 31, 1975.
*1363 *1364 Frank Susman, Clayton, Mo., for plaintiffs.
John C. Danforth, Atty. Gen., Jefferson City, Mo., John F. White, Asst. Circuit Atty., St. Louis, Mo., for defendants.
Before WEBSTER, Circuit Judge, WANGELIN, District Judge, and HARPER, Senior District Judge.

MEMORANDUM OPINION
HARPER, Senior District Judge.
This is an action by plaintiffs seeking to have declared as unconstitutional certain provisions of House Bill No. 1211 (hereinafter referred to as House Bill 1211), passed by the Missouri General Assembly on April 30, 1974, and signed into law on June 14, 1974, and for an injunction against the enforcement of the challenged provisions of the Bill.
Plaintiffs are Planned Parenthood of Central Missouri (hereinafter referred to as Planned Parenthood), a not-for-profit Missouri corporation which maintains facilities for the performance of abortions in Columbia, Missouri; David Hall, a resident of the State of Missouri who supervises abortions at the Columbia *1365 Planned Parenthood facility as a duly licensed physician; and Michael Freiman, a resident of Missouri who performs abortions as a duly licensed physician at the Barnes and Jewish Hospitals in St. Louis, Missouri, and at a St. Louis abortion clinic operated by Reproductive Health Services, Inc. Plaintiffs bring this action on their own behalf and on behalf of the class of physicians desiring to perform pregnancy termination services, and on behalf of the class of their patients who seek abortions. The complaint charges that certain provisions of House Bill 1211 are invalid in that they deprive plaintiffs and their patients of various alleged constitutional rights, including the privacy of the doctor-patient relationship, the physician's right to the free exercise of medical practice, the right of a woman to determine whether to bear children, the right to life of their patients and the right to receive adequate medical treatment, all in violation of the First, Fourth, Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution. The petition further alleges that the legislation is violative of the rights of due process and equal protection guaranteed plaintiffs and their patients under the Constitution, and that it imposes a cruel and unusual punishment upon women by forcing them to bear pregnancies which they conceive.
Jurisdiction of the Court is invoked under 28 U.S.C. §§ 1331, 1343, 2201, 2202, 2281 and 2284, and under 42 U.S. C. § 1983. Because of the claim for injunctive relief, a three-judge court was convened pursuant to 28 U.S.C. § 2281.
In their initial application for a temporary restraining order plaintiffs challenged only Sections 2(2), 6(1), 7 and 9. At the hearing for a preliminary injunction plaintiffs expanded their challenge to include Sections 3(3) and 3(4). During discovery plaintiffs additionally attacked Sections 3(2), 10 and 11. On the day defendants submitted their trial brief, plaintiffs advised defendants of their intention to challenge Sections 5, 6(3) and 8, and the next day Section 4 was included. On the day of trial defendants' motion for continuance as to Sections 4, 5, 6(3) and 8 was granted, and the Court proceeded to trial on the other provisions and set a later date to complete the trial on the late challenged provisions. At the close of the hearing plaintiffs withdrew their challenge to those provisions.
The challenged portions of House Bill 1211 provide as follows:
"Section 2. Unless the language or context clearly indicates a different meaning is intended, the following words or phrases for the purpose of this act shall be given the meaning ascribed to them:
* * * * * *
"(2) `Viability', that stage of fetal development when the life of the unborn child may be continued indefinitely outside the womb by natural or artificial life-supportive systems;
* * * * * *
"Section 3. No abortion shall be performed prior to the end of the first twelve weeks of pregnancy except:
* * * * * *
"(2) After the woman, prior to submitting to the abortion, certifies in writing her consent to the abortion and that her consent is informed and freely given and is not the result of coercion.
"(3) With the written consent of the woman's spouse, unless the abortion is certified by a licensed physician to be necessary in order to preserve the life of the mother.
"(4) With the written consent of one parent or person in loco parentis of the woman if the woman is unmarried and under the age of eighteen years, unless the abortion is certified by a licensed physician as necessary in order to preserve the life of the mother.

*1366 * * * * * *
"Section 6. (1) No person who performs or induces an abortion shall fail to exercise that degree of professional skill, care and diligence to preserve the life and health of the fetus which such person would be required to exercise in order to preserve the life and health of any fetus intended to be born and not aborted. Any physician or person assisting in the abortion who shall fail to take such measures to encourage or to sustain the life of the child, and the death of the child results, shall be deemed guilty of manslaughter and upon conviction shall be punished as provided in Section 559.140, RSMo. Further, such physician or other person shall be liable in an action for damages as provided in Section 537.080, RSMo.
* * * * * *
"Section 7. In every case where a live born infant results from an attempted abortion which was not performed to save the life or health of the mother, such infant shall be an abandoned ward of the state under the jurisdiction of the juvenile court wherein the abortion occurred, and the mother and father, if he consented to the abortion, of such infant shall have no parental rights or obligations whatsoever relating to such infant, as if the parental rights had been terminated pursuant to section 211.411 (sic), RSMo. The attending physician shall forthwith notify said juvenile court of the existence of such live born infant.
* * * * * *
"Section 9. The general assembly finds that the method or technique of abortion known as saline amniocentesis whereby the amniotic fluid is withdrawn and a saline or other fluid is inserted into the amniotic sac for the purpose of killing the fetus and artificially inducing labor is deleterious to maternal health and is hereby prohibited after the first twelve weeks of pregnancy.
"Section 10. 1. Every health facility and physician shall be supplied with forms promulgated by the division of health, the purpose and function of which shall be the preservation of maternal health and life by adding to the sum of medical knowledge through the compliation of relevant maternal health and life data and to monitor all abortions performed to assure that they are done only under and in accordance with the provisions of the law.
"2. The forms shall be provided by the state division of health.
"3. All information obtained by physician, hospital, clinic or other health facility from a patient for the purpose of preparing reports to the division of health under this section or reports received by the division of health shall be confidential and shall be used only for statistical purposes. Such records, however, may be inspected and health data acquired by local, state, or national public health officers.
"Section 11. All medical records and other documents required to be kept shall be maintained in the permanent files of the health facility in which the abortion was performed for a period of seven years."
House Bill 1211 concludes with a clause declaring that the provisions of the Act are severable, so that judicial invalidation of any provision shall not affect such remaining provisions as can be given effect in the absence of the invalid provision.
The threshold question for consideration is the justiciability of this litigation. The individual plaintiff-physicians have standing as to each of the challenged provisions of House Bill 1211 by reason of the criminal sanctions imposed under that Act. In holding that the Georgia physicians who attacked that state's abortion legislation in Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), presented a justiciable *1367 controversy, the Supreme Court stated at page 188, 93 S.Ct. at page 745 of their opinion:
"The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief. Crossen v. Breckenridge, 446 F.2d 833, 839-840 (CA6 1971); Poe v. Menghini, 339 F.Supp. 986, 990-991 (D.C.Kan.1972)."
Section 6(1) of House Bill 1211 provides that an attending physician who fails to exercise the prescribed standard of care to protect an aborted fetus shall be deemed guilty of manslaughter. In addition, Section 14 provides that any person who performs an abortion in violation of the requirements set forth elsewhere in the Act will be guilty of a misdemeanor. This statute is "recent and not moribund", Doe v. Bolton, supra, and we may assume that violations thereof will be actively prosecuted.
Due to the obvious standing of the physician-plaintiffs in this case, the Court deems it unnecessary to pass upon the question of Planned Parenthood's standing to challenge House Bill 1211. See Doe v. Bolton, supra, page 189, 93 S.Ct. 739.
In January of 1973, the United States Supreme Court in the case of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L. Ed.2d 147, declared unconstitutional the Texas criminal abortion statutes which prohibited performance of all abortions except where necessary to save the life of the mother. In doing so, the Court made it clear that its opinion was not intended to prevent the state from limiting or even proscribing abortions under certain circumstances. The Court stated at pages 153-154, 93 S.Ct. at page 727:
"[A]ppellant and some amici argue that the woman's right is absolute and that she is entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever reason she alone chooses. With this we do not agree.

"We * * * conclude that the right of personal privacy includes the abortion decision, but that this right is not unqualified and must be considered against important state interests in regulation." (Emphasis added.)
These state interests include the right to protect maternal health, which justifies regulation of abortion procedures after the first twelve weeks of pregnancy, and the interest in protecting potential human life which allows the state to prohibit abortions once the fetus has achieved viability.
The companion case of Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), emphasized the Court's position with respect to uncontrolled abortion. At page 189, 93 S.Ct. at page 746 of that opinion the Court reiterated:
"Roe v. Wade, supra, sets forth our conclusion that a pregnant woman does not have an absolute constitutional right to an abortion on her demand."
Subsequent to these decisions, Missouri's criminal statute, proscribing abortions where not necessary to save the life of the woman or the unborn child, was declared unconstitutional. Thereafter, the Missouri General Assembly labored through two legislative sessions in order to perfect a bill which would regulate abortion within the parameters established by the Supreme Court. The result is House Bill 1211. This Court has engaged in a careful scrutiny of each of the challenged provisions of this bill and finds that with the exception of Section 6(1) they conform to the Roe and Doe decisions in every material respect.
Section 2(2): Section 5 of House Bill 1211 prohibits performance of abortions except to preserve the life or health of the mother once the fetus is *1368 viable. Plaintiffs do not challenge section 5, rather it is their position that the definition of viability in section 2(2) is invalid because it fails to distinguish between trimesters of pregnancy and because the definition would have the result, when read in conjunction with section 5, of forbidding non-therapeutic abortions at an earlier point than is constitutionally permissible under Roe and Doe. Defendants maintain that the definition adopted by the Missouri legislature is in substance the same as that employed by the Supreme Court.
In Roe, the Court defined the point at which the fetus becomes "viable" as "potentially able to live outside the mother's womb, albeit with artificial aid". (Emphasis added). 410 U.S. at page 160, 93 S.Ct. at page 730. The definition of viability, in House Bill 1211 (Section 2(2)) is essentially the same as that set forth in Roe. If anything, the Missouri definition is more restrictive than that suggested in Roe, since it requires that the life of the fetus be capable of being continued "indefinitely" outside the womb before it is to be considered viable.
Plaintiff Hall stated in that portion of his deposition offered at the trial that viability is a difficult stage to assess, but that he agreed with the definition set forth in Section 2(2) of the statute (Tr. 369).
Plaintiffs suggest that in order to be constitutionally valid, a statutory definition of viability should establish a specific point in gestation when the fetus is to be considered viable. Plaintiffs suggest that the period subsequent to the twenty-fourth week, or approximately the end of the second trimester, would be appropriate. While Roe v. Wade did refer to the fact that viability is usually reached at twenty-four to twenty-eight weeks, 410 U.S. at page 160, 93 S.Ct. 705, the Supreme Court did not elect to preempt the physician's judgment in making this determination. Whereas the Court set the first "compelling point", or the period after which the state may regulate abortion in ways related to the mother's health, at the end of the first trimester, it established the second "compelling" point, after which the state may protect fetal life, at "viability" rather than a specific period after conception, 410 U.S. at pages 163-165, 93 S.Ct. 705.
We do not think it is properly the function of the legislature or the courts to fix viability at an inflexible point in gestation. The time when viability is achieved will vary with each pregnancy, and the determination of whether a fetus is viable in a particular case must be left to the attending physician. Section 2(2) has precisely this effect.
Section 3(2): Section 3(2) requires a woman's informed consent in writing prior to the abortion. The Supreme Court in Roe enumerated a few of the many factors which must be weighed by a woman who is considering an abortion. The Court stated, 410 U.S. at page 153, 93 S.Ct. at page 727:
"Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed motherhood may be involved. All these are factors the woman and her responsible physician necessarily will consider in consultation." (Emphasis added.)
Given the fact that even with counseling the decision of whether to terminate a pregnancy is often a stressful one (Warren Tr. 30, Anderson Tr. 351-352), it is imperative that a woman be well advised of the options available, and the physical and psychological ramifications of choosing a particular course of action.
*1369 After discussing the development of judicial recognition of a constitutional right of privacy, the Supreme Court stated in Roe v. Wade, supra, at page 154, 93 S.Ct. at page 727, that, "We, therefore, conclude that the right of personal privacy includes the abortion decision".
It is clear from the Court's opinion that although the abortion decision is to be made in consultation with a responsible physician, the ultimate decision is not the physician's to make. The consent requirement of Section 3(2) insures that the pregnant woman retains control over the discretions of her consulting physician.
Furthermore, written consent is a common practice of physicians for surgical procedures. This portion of the statute does not single out the abortion procedure, but merely includes it within the category of medical operations for which consent is required.
Sections 3(3) and 3(4): Sections 3(3) and 3(4) require either the written consent of the woman's spouse, or if she is single and under eighteen years of age, the consent of a parent or one in loco parentis. In deciding Roe and Doe, the Supreme Court declined to discuss the rights of the woman's spouse or parents to participate in the abortion decision because neither of the statutes dealt with in those cases contained provisions for spousal or parental consent, 410 U. S. page 165, footnote 67, 93 S.Ct. 705.
Roe v. Wade, held that a woman's limited right to privacy in the area of abortion outweighed the state's interest in protecting her health during the period up to the end of the first trimester of pregnancy when an abortion may be safer than bearing the pregnancy to term, and that this right to privacy also outweighed the state's interest in protecting the life of the fetus prior to the point when that fetus becomes viable. Thus, the only state interests involved in that decision were the protection of maternal health and the protection of the fetus.
Historically the courts have recognized that the marriage entity is one which is subject to the state's control. In approving Utah's ban on polygamy, the Supreme Court in Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878), stated at page 165:
"Marriage, while from its very nature a sacred obligation, is nevertheless, in most civilized nations, a civil contract, and usually regulated by law. Upon it society may be said to be built, and out of its fruits spring social relations and social obligations and duties, with which government is necessarily required to deal."
In Maynard v. Hill, 125 U.S. 190, 8 S.Ct. 723, 31 L.Ed. 654 (1888), the Court reiterated that the marriage entity provides the foundation of our societal structure. At page 205, 8 S.Ct. at page 726 the Court stated:
"Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution."
More recently the Court has based the right of a state to regulate the status of marriage upon the need to protect the "regularity and integrity of the marriage relation." Estin v. Estin, 334 U. S. 541, 546, 68 S.Ct. 1213, 92 L.Ed. 1561 (1948).
Traditional permissible state regulation, therefore, has involved not only laws concerning formulation and dissolution of the relationship but also legislation designed to protect the integrity of the marriage unit. In addition to the polygamy laws discussed in Reynolds v. United States, supra, typical examples of such legislation include the imposition of *1370 punishment for acts such as adultery and bigamy.
Procreation has been held to be a fundamental aspect of the marriage relationship. Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L. Ed. 1655 (1942). Testimony and exhibits introduced at the trial of the instant case establish that there is a direct relationship between induced abortions and the incidence of infertility, premature and still births resulting from subsequent pregnancies (Dr. Backer, Tr. 219, 222-223, Defts' Exs. V, O, S and T). Infants born prematurely are in turn subject to numerous physical and mental defects (Dr. Backer, Tr. 221-222). We are, therefore, not concerned merely with a husband's interest in seeing that a particular fetus conceived by the partners to the marriage is carried to term. We are also confronted with the fact that the decision of whether or not to abort one pregnancy may have a profound effect on the future reproductive capacity of the marriage.
Other testimony at the trial merely supports what should be obvious  that those things which foster mutuality and trust in a marriage tend to strengthen the relationship and the institution of marriage (Dr. Kenkel, Tr. 235-236). In the area of procreation, which is a fundamental aspect of that relationship, the state's interest in protecting the integrity of the marriage unit and the mutuality of decisions made by the partners to that unit becomes particularly compelling. It is difficult to see how marital harmony could possibly be preserved if husbands were precluded from participating in decisions which affect the very essence of the marriage relationship.
The interest of the state in protecting the mutuality of decisions vital to the marriage relationship is compelling at all times during the marriage. It does not vary in importance at different times during the relationship, and certainly is not subject to distinctions between trimesters of the wife's pregnancy.
In considering the validity of the parental consent requirement it is recognized that the interest in protecting the mutuality of a marriage relationship is not present. Nevertheless, "the state's authority over children's activities is broader than over like actions of adults." Prince v. Massachusetts, 321 U.S. 158, 168, 64 S.Ct. 438, 443, 88 L.Ed. 645 (1945). In Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), the Supreme Court pointed out that the state has a duty to support parents in the discharge of their responsibility for the care of their children. The Court stated at page 639, 88 S.Ct. at page 1280:
"The well-being of its children is of course within the State's constitutional power to regulate, * * *. [C]onstitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society. * * * [P]arents and others * * * who have this primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility."
In fact, the state may not unduly interfere with that parental responsibility. Wisconsin v. Yoder, 406 U.S. 205 (1972), l. c. 231-234, 92 S.Ct. 1526, 32 L.Ed.2d 15; Pierce v. Society of Sisters, 268 U.S. 510 (1924), l. c. 534-35, 45 S. Ct. 571, 69 L.Ed. 1070.
The state's interest in safeguarding the authority of the family relationship would appear to this Court to be a compelling basis for allowing regulation of a minor's freedom to consent to an abortion. The requirement of parental consent in section 3(4) of House Bill 1211 does not single out the abortion procedure, since it is the practice of hospitals and physicians to require that a minor's parent consent to other surgical treatment as well.
In discussing the validity of Section 3(2) above, we held that the consent of *1371 the woman is an indispensable prerequisite to obtaining an abortion. Yet a person under the age of majority is deemed incapable of giving legal consent. We do not believe that the Supreme Court, in recognizing a woman's limited right to obtain an abortion in Roe and Doe, intended those decisions to have the effect of emancipating children in that respect. Testimony at the trial of this case disclosed that children as young as ten years old have sought abortions (Widdicombe, Tr. 164). A girl of that age cannot be presumed capable of making a decision as profound as the abortion decision without proper advice and counsel of her parents or a person in loco parentis.
We do not believe that in weighing the state's interests in protecting maternal health and fetal life, the Supreme Court in Roe and Doe intended to preclude the consideration of other fundamental state interests. The consent requirements of the Missouri abortion law are justified by such other compelling interests.
Section 6(1): The first sentence of Section 6(1) prescribes the standard of care which a person performing an abortion must exercise for the protection of the fetus, without reference to any particular stage of pregnancy. The second and third sentences of this provision impose criminal and civil liability for failure to "take such measures to encourage or sustain the life of the child", when "the death of the child results" from such failure. While it is obvious that the state can legislate to protect a live born infant, and we have pointed out at the outset of our discussion on the merits that Roe would permit the state to legislate on behalf of the fetus after the point of viability is achieved, the difficulty with Section 6(1) is that it imposes a standard of care for protection of the fetus which would apply at any stage of pregnancy.
Defendants argue that the proper construction to be given this section is that it requires attending medical personnel to take positive action only subsequent to an abortion in the event the fetus is aborted alive. Reflection upon the language employed convinces us otherwise. While the second sentence speaks of sustaining the life of the "child", clearly referring to a live born infant, the first sentence directs that a person performing an abortion must protect the life and health of the "fetus". The Court, therefore, holds that the first sentence of Section 6(1) is unconstitutionally overbroad for failure to exclude the stage of pregnancy prior to viability.
Section 7: Section 7 provides that where a live infant results from an attempted abortion which was not performed to save the life or health of the mother, such infant shall be an abandoned ward of the state under the jurisdiction of the Juvenile Court, and the rights of the parents consenting to the abortion shall be terminated. This section also requires the attending physician to forthwith notify the juvenile court of the existence of such live born infant. All of plaintiffs' several arguments that such summary termination is violative of due process must give way to the reality of the circumstances surrounding the occurrence of a live birth during an attempted abortion. The immediate concern must be for the care and protection of the infant. The fate of such a live born infant is surely of as much interest to the state as the interest in potential human life which the state can protect under Roe.
In the rare instance in which a live birth would result from an attempted abortion the state would be justified in assuming immediate temporary custody of the unwanted child. It is a simple matter for the juvenile court to insure that parents of such a child be given an adequate opportunity to be heard before parental rights are premanently terminated. Section 7 specifically provides that the parents of a child aborted alive shall have no parental rights as if their "rights had been terminated pursuant to section 211.411" (sic) of the Missouri *1372 Revised Statutes. RSMo 211.441, V.A. M.S., sets forth the circumstances under which parental rights may be terminated. These circumstances include abandonment of the child, which is exactly the situation Section 7 is designed to protect. Chapter 211 of the Missouri statutes provides for notice, an opportunity for the parents to be heard and present testimony on their behalf, right to counsel and right to a jury trial of the issues. House Bill 1211 thus incorporates by reference statutory due process guarantees which provide adequate protection to the parents of a live aborted child who might desire to regain custody of such a child.
Nor can this Court find fault of constitutional magnitude with respect to the reporting requirement of Section 7. A report of every birth in Missouri must currently be filed with the state division of health by the physician, midwife, or other person in attendance at the birth. RSMo 193.100. Section 7 of the challenged legislation simply requires that in certain instances the attending physician must also report the existence of a live birth to the juvenile court. The inclusion of such reporting acts within the state's police power is not questioned. The requirement that a live birth resulting from an attempted abortion be reported to the juvenile authorities in addition to the division of health does not impose an undue burden upon attending physicians.
Section 9: Section 9 prohibits use of the saline amniocentesis method of abortion after the first twelve weeks of pregnancy. Plaintiffs contend that this provision is invalid for the reason that it invades the province of the physician by restricting his exercise of medical judgment in performing abortions.
In summarizing the effect of its decision in Roe v. Wade, supra, the Supreme Court stated 410 U.S. at page 165-166, 93 S.Ct. at page 733 of that opinion:
"This holding, we feel, is consistent with the relative weights of the respective interest involved, with the lessons and examples of medical and legal history, with the lenity of the common law, and with the demands of the profound problems of the present day. The decision leaves the State free to place increasing restrictions on abortion as the period of pregnancy lengthens, so long as those restrictions are tailored to the recognized state interests. The decision vindicates the right of the physician to administer medical treatment according to his professional judgment up to the points where important state interests provide compelling justifications for intervention." (Emphasis added.)
The Court specifically held that:
"With respect to the State's important and legitimate interest in the health of the mother, the `compelling' point, in the light of present medical knowledge, is at approximately the end of the first trimester. * * * [A]fter this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health." Id., at page 163, 93 S.Ct. at pages 731, 732.
Thus the judgment of the physician is only unfettered during the first twelve weeks of pregnancy. State regulation of the abortion procedure is not an invalid infringement upon the medical judgment of the physician after the first trimester unless the regulation is not reasonably related to maternal health. Section 9 seeks only to proscribe the saline method during the period subsequent to the first trimester. The only question remaining is whether prohibition of this particular method of abortion is within the power of the state legislature as being "reasonably related" to the protection of maternal health.
The record of trial discloses that use of the saline method exposes a woman to the danger of severe complications, regardless of the skill of the physician or the precaution taken. Saline may cause one or more of the following conditions: Disseminated intravascular *1373 coagulation or "consumptive coagulopathy" (disruption of the blood clotting mechanism [Dr. Warren, Tr. 57-58; Dr. Klaus, Tr. 269-270; Dr. Anderson, Tr. 307; Defts' Exs. H & M]), which may result in severe bleeding and possibly death (Dr. Warren, Tr. 58); hypernatremia (increase in blood sodium level), which may lead to convulsions and death (Dr. Klaus, Tr. 268); and water intoxication (accumulated water in the body tissue which may occur when oxytoxin is used in conjunction with the injection of saline), resulting in damage to the central nervous system or death (Dr. Warren, Tr. 76; Dr. Klaus, Tr. 270-271; Dr. Anderson, Tr. 310; Defts' Ex. L). There is also evidence that saline amniocentesis causes massive tissue destruction to the inside of the uterus (Dr. Anderson, Tr. 308).
Still, as plaintiffs have pointed out, the fact that saline presents a serious threat to the health of a woman undergoing this technique of abortion is not determinative of the issue. Every known medical procedure involves a certain degree of risk to the patient. The reason given by the Supreme Court in holding that a state may not regulate the abortion procedure on the basis of the mother's health until the end of the first trimester was "because of the now-established medical fact * * * that until the end of the first trimester mortality in abortion may be less than mortality in normal childbirth." (Emphasis added.) Roe v. Wade, supra, at page 163, 93 S.Ct. at pages 731, 732.
Testimony at trial established that the mortality rate in childbirth is approximately twenty per one hundred thousand (Dr. Warren, Tr. 44; Dr. Kerenyi, Tr. 94); mortality with saline is approximately fifteen per one hundred thousand (estimates range from twelve to twenty-five per one hundred thousand; Dr. Warren, Tr. 43-44; Dr. Kerenyi, Tr. 89; Dr. Anderson, Tr. 329-330). Therefore, the validity of the Missouri legislature's refusal to permit use of the saline method after the twelfth week of pregnancy must turn on the availability of safe alternative methods of inducing abortions.
Alternative procedures for inducing midtrimester abortion include surgery (hysterotomy and hysterectomy), injection of drugs either intramniotically or extraovulary, and mechanical stimulation. The most significant of these methods is the intraamniotic injection of prostaglandin. Dr. Anderson, Chief of Obstetrics at Yale University, testified that he knew of no known deaths associated with prostaglandins as of the date of trial (Tr. 323). Only Dr. Kerenyi would not say that prostaglandin is safer than saline amniocentesis (Tr. 93). All of the other medical witnesses, including both of the individual plaintiff-physicians, agreed that prostaglandin was safer (Dr. Warren, Tr. 56; Dr. Klaus, Tr. 274; Dr. Anderson, Tr. 327-328; Dr. Freiman, Tr. 368; Dr. Hall, Tr. 369-370).
Dr. Freiman stated in his deposition, portions of which were introduced into evidence at trial, that "the risk of prostaglandin is thought to be even less than the risk of saline amniocentesis" (Tr. 368). Similarly, Dr. Hall admitted that prostaglandin was developed in order to avoid the complications inherent with the use of saline (Tr. 369-370). Dr. Anderson's endorsement of prostaglandin was so strong that he suggested physicians should be liable for malpractice if they chose saline over prostaglandin after having been given all the facts on both methods (Tr. 336). It appears that prostaglandin has only been in use for about five years, compared with over ten years of experience with saline (Dr. Kerenyi, Tr. 94). However, the use of all abortion procedures was extremely limited until passage of the abortion reform law in the State of New York four years ago, (Dr. Kerenyi, Tr. 94).
Nor is prostaglandin the exclusive alternative to saline amniocentesis. The mechanical means of inducing abortion are also less dangerous (Dr. Klaus, Tr. 274).
*1374 Testimony as to the legislative history of House Bill 1211 disclosed that the Missouri General Assembly based its conclusion as to the dangers of saline on extensive medical evidence. Representative O'Toole, one of the sponsors of the bill, testified that numerous medical publications on abortion procedures were made available to the legislature, including defendants' Exhibits W, Y, Z, AA, M, BB, CC, DD, J and K (Tr. 186-191), and that there was extended discussion in both the House and Senate as to the relative merits of the various procedures (Tr. 182-183). The conclusion of the Missouri General Assembly is adequately supported by the record. The proscription against use of saline amniocentesis is reasonably related to maternal health and is, therefore, within the power of the legislature.
Sections 10 and 11: Sections 10 and 11 pertain to the maintenance of abortion records. The acquisition of data is essential to the advancement of medical knowledge. These provisions establish reporting procedures for statistical purposes only, and require that the division of health ensure the confidentiality of all information. Nothing in these sections would serve to restrict either the abortion decision itself or the exercise of medical judgment in performing an abortion.
This memorandum opinion is adopted by the Court as its findings of fact and conclusions of law, and the clerk of the court will prepare and enter the proper judgment to the effect that Sections 2(2), 3(2), 3(3), 3(4), 7, 9, 10 and 11 of House Bill 1211 are constitutional, and that Section 6(1) of House Bill 1211 is unconstitutional and defendants are enjoined from enforcing Section 6(1) of House Bill 1211.
WEBSTER, Circuit Judge (concurring in part and dissenting in part).
I concur in the majority opinion upholding the constitutional validity of Section 2(2)[1] (defining "viability"), Section 3(2) (requiring the woman's written consent to an abortion), Section 10 (maintenance of records) and Section 11 (retention of records). I concur in the majority opinion holding that Section 6(1) (standard of care) is unconstitutionally overbroad. I dissent from the majority opinion upholding the constitutionality of Section 3(3) (requiring spousal consent), Section 3(4) (requiring parental consent where the woman is unmarried and under the age of 18 years), Section 7 (terminating parental rights if child is born alive) and Section 9 (prohibiting use of the saline amniocentesis method of abortion).

Pregnant Woman's Consent
I join in the views expressed by the majority upholding Section 3(2), and I add one further reason in support of its validity. The state has been told it may have no part in the abortion decision during the first trimester  that this is a decision to be left to the medical judgment of the pregnant woman's attending physician "in consultation with his patient." Roe v. Wade, 410 U.S. 113, 163, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The requirement of Section 3(2) that a woman evidence her consent in writing is not burdensome or chilling, but instead manifests a legitimate interest of the state that this important decision has in fact been made by the person constitutionally empowered to do so. The evidence at trial supports the conclusion that, as presently practiced, the abortion decision may not always be made in the one-on-one deliberative manner contemplated by the Supreme Court.[2] Professor Tribe has interpreted Roe not as a precedent in favor of abortion over continued pregnancy but instead *1375 as "a decision about who should make judgments of that sort." Tribe, Foreword: Toward a Model of Roles in the Due Process of Life and Law, 87 Harv.L.Rev. 1, 11 (1973). The requirement of written consent, as framed by Section 3(2), reinforces the locus of that authority and in no way interposes the state or third parties in the decision-making process. Any regulations adopted pursuant thereto will of course be subject to judicial scrutiny, but only the statute is before us at this time.

Spousal Consent
Section 3(3) requires the consent of the spouse of a married woman seeking an abortion prior to the end of the first 12 weeks of pregnancy. Strong as is the state's interest in protecting the "regularity and integrity of the marriage relation," I cannot agree that such interest permits the state to delegate to a spouse a veto power which the state itself is absolutely and totally prohibited from exercising during the first trimester of pregnancy.
In Roe v. Wade, supra, the Supreme Court recognized that after the first trimester of pregnancy "a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health." 410 U.S. at 163, 93 S.Ct. at 732. In the very next breath, however, it said:
This means, on the other hand, that, for the period of pregnancy prior to this `compelling' point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State.
In contrast to the requirement of Section 3(2) that the woman manifest her own consent in writing, which imposes no restriction on the decision-making process, Section 3(3) places an impermissible condition upon the fundamental right of a woman to elect an abortion during the first trimester, and it thus runs afoul of the Roe mandate against interference, quoted supra. Research has disclosed no other court which has held otherwise. See Coe v. Gerstein, 376 F.Supp. 695 (S.D.Fla.1973), appeal dismissed, cert. denied per curiam, 417 U.S. 279, 94 S.Ct. 2246, 41 L.Ed.2d 68 (1974); Doe v. Rampton, 366 F.Supp. 189 (D.Utah 1973); Doe v. Doe, Mass., 314 N.E.2d 128 (1974); Jones v. Smith, 278 So.2d 339 (Fla.Ct.App.1973), cert. denied, 415 U.S. 958, 94 S.Ct. 1486, 39 L.Ed.2d 573 (1974).
The marital union is not exalted above the individual in the constitutional scheme. As the Supreme Court said:
[T]he marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. If the *1376 right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.
Eisenstadt v. Baird, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972) (emphasis in original).
In Roe v. Wade, supra, the Supreme Court expressly declined to consider the collateral rights of a spouse which might flow from a woman's decision to have an abortion during the first trimester.[3] 410 U.S. at 165 n. 67, 93 S.Ct. 705. I see no need to speculate upon such rights in this case. It is clear to me that whatever his civil claims against the doctor, the hospital or even his wife, the state may not regulate to protect the interests of the husband if it interferes in any significant way with the woman's right to have the abortion. Section 3(3) can have no other effect.[4]

Parental Consent
Section 3(4) is constitutionally infirm for the same reasons as is Section 3(3), but additional comment is required. It is suggested that the Supreme Court did not intend to emancipate females under the age of 18 and also that Roe and Doe should not be read so as to permit minor children to be alienated from proper parental supervision. The short constitutional answer is that the Fourteenth Amendment does not differentiate between adults and minors, and such distinctions have been repeatedly rejected. See In re Gault, 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). See also In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1968).
But this is not the whole answer, for the Supreme Court has held that even where constitutional rights are at stake, a state may impose more stringent regulations on the activities of children than it may adopt with respect to adults. Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). Yet, I do not suppose it could be seriously argued that a minor could be made to submit to an abortion at the insistence of her parents. In re Smith, 16 Md.App. 209, 295 A.2d 238 (1972). I cannot see why she would not be entitled to the same right of self-determination now explicitly accorded to adult women, provided she is sufficiently mature to understand the procedure and to make an intelligent assessment of her circumstances with the advice of her physician.[5]See Ballard v. Anderson, 4 *1377 Cal.3d 873, 95 Cal.Rptr. 1, 484 P.2d 1345 (1971) (en banc); Wasserman, Implications of the Abortion Decisions: Post Roe and Doe Litigation and Legislation, 74 Colum.L.Rev. 237, 245-47 (1974); Pilpel and Zuckerman, Abortion and the Rights of Minors, 23 Case W.Res.L.Rev. 779 (1972); cf. Coe v. Gerstein, supra; Doe v. Rampton, supra. The challenged section does not make this distinction and is thus, in my opinion, unconstitutionally overbroad in that it could interfere with protected rights within the first trimester of pregnancy of one physically and mentally competent to exercise those rights.[6]

Termination of Parental Rights
Section 7 makes an infant born alive following an attempted abortion which was not performed to save the life or health of the mother "an abandoned ward of the state under the jurisdiction of the juvenile court wherein the abortion occurred * * *." It further provides that a parent who consented to such abortion "shall have no parental rights or obligations whatsoever relating to such infant, as if the parental rights had been terminated pursuant to Section 211.411 [sic], RSMo."
This section in my view contains an incurable constitutional flaw: it is totally lacking in procedural due process. The majority opinion views this section as a compassionate effort on the part of the state to make sure that an unwanted child is never for a moment without protection, and it assumes that parents will be accorded the same hearing rights as are found in Section 211.441, RSMo, which provides a statutory plan for terminating parental rights in other circumstances. I respectfully disagree.
First, the statutory language rebuts any inference of an intended hearing. It states that as to such live born infant the parent who consented to the abortion "shall have no parental rights or obligations whatsoever, as if the parental rights had been terminated pursuant to Section 211.411 [sic], RSMo." (Emphasis added.) The only interpretation which I can give to such clause is that parental rights are to be terminated upon the birth of the child as if all of the statutory procedures for termination of parental rights had already taken place. Significantly, Section 211.441, RSMo, does not make a child an abandoned ward of the state prior to hearing as does this Section 7. I do not understand the state to have argued for the construction placed upon Section 7 by the majority, and I cannot accept it. It seems to me abundantly clear that the state proposes to take a live born child away from its parents, if they consented to an abortion, because in the view of the state it was "unwanted," and for this reason alone the consenting parents have forfeited all rights to such child. This posture ignores entirely the range of alternatives available and assumes that because a mother may for a variety of reasons have decided upon an abortion she would with certainty abandon the child if it should be born alive, or, more invidiously, that she thereby became unworthy to keep the child. No state has the right to make this judgment on a per se basis. See Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). The chilling effect of such legislation is so obvious as to require no further discussion; it clearly and explicitly exceeds regulation "reasonably related to maternal health." Roe v. Wade, supra, 410 U.S. at 164, 93 S.Ct. 705.

*1378 The Saline Procedure

Section 9 presents in many respects the most difficult section for constitutional analysis. Clearly a state may act to prevent conduct which threatens the health of its citizens. We deal here, however, not with problems of contagion but with individual choices in medical techniques for the termination of pregnancy. After hearing considerable testimony, the Missouri Legislature determined that the technique known as saline amniocentesis was "deleterious to maternal health" and therefore prohibited its use after the first twelve weeks of pregnancy. The exclusion of the first twelve weeks is explained as avoidance of the regulation during the first trimester of pregnancy, as required by Roe; as a practical matter the saline process has not been used by physicians during the first trimester.
Judge Harper has summarized most of the significant medical testimony with respect to the saline procedure and available alternatives, as well as the mortality risks, counter-indications and side effects of each, and I need not repeat them here. The question, it seems to me, is whether the state has demonstrated a sufficiently compelling interest in maternal health to justify interfering, in a legislative way, with "the right of the physician to administer medical treatment according to his professional judgment," Roe v. Wade, 410 U.S. at 165, 93 S.Ct. at 733, and whether in this instance, the legislation has been "narrowly drawn to express only the legitimate state interests at stake." Roe v. Wade, 410 U.S. at 155, 93 S.Ct. at 728 (emphasis added).
It is conceded that prior to the enactment of this statute a statute mandating the application of a prophylactic solution to the eyes of newly born infants was the only known attempt by the Missouri Legislature to interfere with medical judgment in maternity cases.[7] Section 9 outlaws in Missouri a procedure now employed throughout the United States in approximately seventy-five per cent of all second and third trimester abortions. That fact alone should have given the legislature some pause. It is undisputed in the testimony in this case that the mortality rate from use of saline is less than in childbirth. It is also significantly safer than two alternative procedures  hysterotomy and hysterectomy  yet neither of these surgical procedures were proscribed.[8]
Saline has been in use for over ten years. The main thrust of the state's argument is that a newer process known as prostaglandin is safer than saline. That may well be, although the drug has only been available on a non-experimental basis for slightly more than one year.[9] It is not now readily available. It too has counter-indications  for persons suffering from glaucoma and asthma. Dr. Anderson, one of the state's chief witnesses, and an ardent advocate of the prostaglandin method, refused to characterize the saline procedure as unsafe. It is thus not unfair to conclude that the only thing that Section 9 accomplishes is the proscription of a procedure now utilized by physicians in seventy-five per cent of all second and third trimester abortions even though less safe methods are still permitted and the legislatively favored method of prostaglandin is not readily available. I cannot agree that such regulation is reasonably related to maternal health; to the contrary, this seems to be the kind of unwarranted intrusion in medical discretion *1379 which the Supreme Court has held infringes upon the patient's constitutional rights.[10]See Word v. Poelker, 495 F.2d 1349 (8th Cir. 1974).[11]
NOTES
[1] All section references in this paragraph are to Missouri House Bill 1211, enacted into law June 14, 1974.
[2] Judith Widdicombe, Executive Director of Reproductive Health Services, Inc., a not-for-profit corporation, testified with respect to the customary procedure followed by the agency. The patient is first requested to see her own doctor and verify the fact of pregnancy and expected term. Thereafter, she is invited to come in for counseling. Reproductive Health Services has 87 associated counselors, including clergymen, nurses and psychologists. Various options are explained to the patient, including the possibility of adoption and medical and economic support sources during the period of pregnancy. If the patient elects to terminate pregnancy and fulfills certain guidelines, a doctor is chosen from a scheduling roster. The doctor performs an average of 8 abortions in a 3½ hour session. After the abortion the patient is told to see her private physician. The agency makes a one-month and one-year post-termination follow-up for evaluation purposes. Consents were routinely required.

Planned Parenthood of Central Missouri utilizes a number of counselors, including social workers, none of whom are physicians. A physician sees the patient to determine whether or not she is pregnant. He apparently does not participate in the counseling process. All of the abortions are performed by the same doctor.
Dr. Thomas D. Kerenyi, Associate Professor and Director of the out-patient department of the Department of Obstetrics and Gynecology at Mount Sinai School of Medicine in New York City, testified that in the four years in which abortions have been permitted in New York, he has personally participated in between 4,000 and 5,000 abortions.
[3] The Supreme Judicial Court of Massachusetts made the distinction clear in this way:

Nothing we say here is intended to affirm or deny a right in the husband to divorce, separation, child custody, or the like by reason of an abortion procured by his wife without his consent. We are deeply conscious of the husband's interest in the abortion decision, at least while the parties are living together in harmony. Surely that interest is legitimate. Surely, if the family life is to prosper, he should participate with his wife in the decision. But it does not follow that he must have an absolute veto, or that his veto, reasoned or unreasoned, can be enforced by the Commonwealth.
Doe v. Doe, Mass., 314 N.E.2d 128, 133 (1974).
[4] At trial, Dr. James C. Warren, Chairman of the Department of Obstetrics and Gynecology at Washington University School of Medicine and a member of the staff of Barnes Hospital, testified that since June 15, 1974, he had received requests for abortions from married women, some of whom could not obtain spousal consent and some of whom would not obtain spousal consent; all of the women who did not obtain such consent were refused abortions because of Section 3(3). Judith Widdicombe, Executive Director of Reproductive Health Services, Inc., testified that from June 15, 1974, through July 22, 1974, as a direct result of Section 3(3), her organization had refused abortion services to 22 women who would not obtain spousal consent and to 38 women who could not obtain such consent.
[5] In Missouri, the right of a person under the age of twenty-one to give legal consent to examination, treatment, hospitalization, medical and surgical care for pregnancy, venereal disease and drug or substance abuse is expressly recognized. RSMo § 431.063; see RSMo § 431.062.
[6] An additional reason for rejecting third party consents was expressed in Wolfe v. Schroering, 388 F.Supp. 631, Civil Action No. C-74-186-L(B) (W.D.Ky., 1974):

Further, as affects the interest of protecting maternal health, the broad provision as written gives power to the husband or parent to withhold consent without any reason, or without good or sufficient reason, and entirely unconnected with the pregnancy of the woman's health.
388 F.Supp. at 636-637.
[7] RSMo § 210.070.
[8] Mortality figures for the surgical procedures indicate a death rate of approximately 200 per 100,000 compared with 15 per 100,000 using saline.
[9] Dr. Warren, Chairman of the Department of Obstetrics and Gynecology at Washington University School of Medicine, testifying for the plaintiffs, said that there is at the present time no reason to believe that the mortality rate with prostaglandin is less than that with saline. [Tr. 42.]
[10] It may be argued that the state's compelling interest in potential human life justifies the proscription of the use of saline, since this process is more likely than other processes to result in the death of the fetus. Thus a persuasive argument can be made that the power to proscribe abortions includes the power to prohibit a means of abortion deemed most lethal to the fetus. We cannot reach this argument here, however; first, it has not been briefed or fully urged upon us, and second, it could only apply in the period following viability, Roe v. Wade, supra, 410 U.S. at 163, 93 S.Ct. 705, whereas Section 9 applies both to the second and third trimesters. If in the course of time prostaglandin proves to be a safer, more efficacious and more readily available medical procedure than saline, I have no doubt that it will become the procedure predominately in use in second and third trimester abortions. But this process should take place in the customary way, through research and experience, and not under criminal sanctions imposed by a single legislature. The mother is likewise protected against an individual practitioner who "abuses the privilege of exercising proper medical judgment [by] the usual remedies, judicial and intra-professional * * *." Roe v. Wade, supra, 410 U.S. at 166, 93 S.Ct. at 733.
[11] Noting that there were no physicians in Kentucky competent in the technique of prostaglandin amnio infusion, that there were neither centers nor doctors in the area licensed to perform the procedure and that an effective and safe method of abortion should be generally available, a three-judge court in Kentucky held a similar section invalid. Wolfe v. Schroering, 388 F.Supp. 631, Civil Action No. C-74-186-L(B) (W.D.Ky., 1974).