William **BAIRD** et al., Plaintiffs,

v.

Francis **BELLOTTI**, Attorney General of the Commonwealth of Massachusetts, et al., Defendants,

Jane Hunerwadel, Defendant-Intervenor.

Civ. A. No. 74–4992–F.

United States District Court, D. Massachusetts.

April 28, 1975.

Roy Lucas, Washington, D. C., Joan C. Schmidt, Boston, Mass., for plaintiffs.

Kenneth Behar, Asst. Atty. Gen., Boston, Mass., for defendant Quinn.

John V. Mahoney, II, Boston, Mass., for D. A. Garrett Byrne.

Mary T. Welby, Brian A. Riley, Mary Laura Russell, Robert Reynolds, Boston, Mass., for intervenors, Parents.

John Reinstein, Roger Stokey, Goodwin, Procter & Hoar, Boston, Mass., for Amici Curiae, Civil Liberties Union-Planned Parenthood.

George G. Burke, Dedham, Mass., Philip A. Rollins, New Bedford, Mass., Matthew H. Ryan, Jr., Springfield, Mass., John P. S. Burke, Salem, Mass., John M. Callahan, Northampton, Mass., John J. Droney, East Cambridge, Mass., A. Stanley Littlefield, Brockton, Mass., William T. Buckley, Worcester, Mass., for defendants district attorneys.

OPINION

Before ALDRICH, Senior Circuit Judge, JULIAN, Senior District Judge, and FREEDMAN, District Judge.

ALDRICH, Senior Circuit Judge.

This is an action brought as a class action, to enjoin, as unconstitutional on its face, the enforcement of a Massachusetts statute, Mass.G.L. c. 112, § 12P, enacted to take effect November 1, 1974, by Mass.Acts 1974, c. 706. The statute makes it a criminal offense to perform an abortion upon a minor without the consent of both parents as well as that of the minor, with certain exceptions, the most important being that the parents' refusal may be overruled by a superior court judge "for good cause shown." The pertinent paragraph reads as follows.

"Section 12P(1). If the mother is less than eighteen years of age and has not married, the consent of both the mother and her parents is required. If one or both of the mother's parents refuse such consent, consent may be obtained by order of a judge of the superior court for good cause shown, after such hearing as he deems necessary. Such a hearing will not require the appointment of a guardian for the mother."

*Standing.*

Plaintiffs are William Baird; Mary Moe I, hereinafter Mary Moe;[1] Parents Aid Society, Inc., hereinafter Parents Aid, and Gerald Zupnick. Defendants are Francis Bellotti, Attorney General of the Commonwealth;[2] Garrett Byrne, district attorney for the County of Suffolk, and the district attorneys of all other counties in Massachusetts. Intervening defendants are Kathleen Roth et al., whom we permitted to intervene on behalf of, and as representatives of, Massachusetts parents

---

1. Three other Mary Moes were named, but no evidence supporting their standing was introduced, and we dismiss as to them for want of proof.

2. Replacing Robert Quinn, the incumbent at the time this action was brought.

having unmarried minor daughters who are, or who might become,[3] pregnant. No evidence or stipulation was introduced as to any intervenors except Jane Hunerwadel. To be consistent, n. 1, ante, we must dismiss as to all the others. Mrs. Hunerwadel has three minor daughters, one in her teens, none pregnant as far as she knows. Like defendants, she does not know the identity of Mary Moe, and represents her only in the general sense that she may represent parents of all nubile minor females in Massachusetts who may, in their opinion unwisely or improperly, wish to have an abortion without informing them.

Plaintiff Mary Moe is an unmarried minor residing at home with her parents in Massachusetts. At the time of the institution of the action she was 16 years of age and about 8 weeks pregnant.[4] She has not informed her parents of her condition, and does not wish to. Her father had told her, in connection with the pregnancy of a contemporary friend, that if that happened to her he would evict her and kill her boy friend. She did not know how far to believe this, except that she felt certain he would take some physical action against the boy. The boy, also 16, was a three-months acquaintance with whom she is no longer associating. Her relations with and affection for her family are "average good." There was no sexual instruction, no one caring to initiate the subject. There is no religious factor. She knew vaguely about contraception, but had no access to materials, and "didn't care to wait until [she] was 18." Her reasons for not informing her parents were in part apprehension of what might happen to her as a result of their learning she had had intercourse, in part the fear of what would happen to her boy friend, and in part the desire to spare her parents' feelings. She did confide in her older sister. Pregnancy would not have kept her from attending school.[5]

In connection with Mary Moe's capacity to represent a plaintiff class, F.R. Civ.P. 23(a)(4), we find, following examination and cross-examination in camera, that she is of average intelligence and awareness; that her emotional age at least corresponds with her chronological age, and that she had made a considered decision, before she learned of her pregnancy, that in case of pregnancy she would seek to abort, and that she was competent to make and effectuate that decision. If relevant, she did not learn of the other plaintiffs until someone else had determined that she was pregnant. We find that she is fairly representative of a substantial class of unmarried minors in Massachusetts who have adequate capacity to give a valid and informed consent, and who do not wish to involve their parents. This, of course, requires standing, but there can be no

3. Plaintiffs object to the latter's standing, citing Mr. and Mrs. Doe in Roe v. Wade, 1973, 410 U.S. 113, 128, 93 S.Ct. 705, 35 L. Ed.2d 147. We think the situation distinguishable.

4. Mary Moe has since had an abortion, performed by Dr. Zupnick following a restraining order issued in this case suspending the operation of the statute. It is not suggested that this moots the action as to her. Roe v. Wade, ante, 410 U.S. at 125, 93 S.Ct. 705.

5. Defendants contend that the court should have appointed a guardian ad litem for Mary Moe, citing F.R.Civ.P. 17(c). We do not do so. Foe v. Vanderhoof, D.Colo., 1975, 389 F.Supp. 947. In connection therewith we make the following findings. Mary Moe is of ample intelligence to, and in fact does, fully understand the nature of this action and has voluntarily participated therein. Here interests in the facial interpretation of and effect of the statute are fully represented by her competent counsel, and to the extent that there may be thought to be any conflicting interests, by the action of competent counsel for the intervening parent. Finally, we observe, although we do not make it a basis for our decision, that insofar as we look to state law, cf. Marshall v. Mulrenin, 1 Cir., 1974, 508 F.2d 39, the statute in question, which offers the minor a superior court hearing if her parents refuse their consent to an abortion, provides that the court need not appoint a guardian although in such instance no one at all may be representing her.

question of Mary Moe's standing to bring this action. Though the statute does not in terms subject her to criminal liability, its enforcement [6] would prevent her, absent violation by someone, from obtaining an abortion without compliance with its terms. Thus, she exhibits "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues," Baker v. Carr, 1962, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, thereby demonstrating "a logical nexus . . . between the status asserted by the litigant and the claim [she] presents . . . ." Flast v. Cohen, 392 U.S. 83, 102, 88 S. Ct. 1942, 1953, 20 L.Ed.2d 947. *See* Roe v. Wade, ante, 410 U.S. at 124, 93 S.Ct. 705. Abele v. Markle, 2 Cir., 1971, 452 F.2d 1121, 1125.[7]

Plaintiff William Baird is the founder and director of plaintiff Parents Aid. He describes himself as being, among other things, a pioneer and advocate for the free availability of abortions. He has a strong personal interest in that sense, but no financial or other tangible concern. *But cf.* Sierra Club v. Morton, 1972, 405 U.S. 727, 738, 92 S.Ct. 1361, 31 L.Ed.2d 636; Data Processing Service v. Camp, 1970, 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184. Baird claims standing because he wishes to assist Parents Aid, which allegedly, if the statute were in force, would make him an accessory. *See* Griswold v. Connecticut, 1965, 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510. Arguably, this is too remote an interest to confer standing. If any citizen who might like to violate a law may contest it, the doctrine of standing would be meaningless. *Cf.* Roe v. Wade, ante, 410 U.S. at 128, 93 S.Ct. 705, and cases cited. On the other hand, Baird's contemplated activities are far less speculative than those there found insufficient. As director of Parents Aid, Baird for some time has provided minors with abortion counseling and services, and the mere continuation of this activity, the mere preservation of the status quo, would subject him to criminal liability. *Cf. Griswold*, ante, 381 U.S. at 481, 85 S.Ct. 1678; *Abele*, ante, 452 F.2d at 1125. In the light of the unassailable standing of other plaintiffs, however, *see* post, we do not pass on the question of Baird's standing.

Plaintiff Parents Aid is organized as a Massachusetts non-profit corporation. It provides, through its medical director and supporting personnel, abortions for varying fees, depending upon ability to pay. About 15% it performs without charge. The Society's standing is conferred not only by its direct subjection to criminal liability, but also by the recognition that even general enforcement of the statute against physicians alone would seriously interfere with its ongoing activities. Doe v. Bolton, 1973, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201; Truax v. Raich, 1915, 239 U.S. 33, 38–39, 36 S.Ct. 7, 60 L.Ed. 131.

Plaintiff Gerald Zupnick, a resident of New York, is a physician licensed in Massachusetts, and is Parents Aid's medical director. He works regularly at the latter's place of business two days a week, performing abortions on a fee basis. Dr. Zupnick's standing in this action is beyond question. The statute at issue applies directly to his activities,

---

6. Suit was brought shortly before the effective date of the statute and a restraining order was promptly issued. This order has since been continued without a separate hearing for a preliminary injunction with at least the tacit consent of the defendants, first because of their need for depositions, and thereafter because of scheduling difficulties with respect to their witnesses.

7. We do not agree with defendants' insistence that in order to have standing Mary Moe must first exhaust the statutory conditions. *Cf.* McNeese v. Board of Education, 1963, 373 U.S. 668, 670–72, 83 S.Ct. 1433, 10 L.Ed.2d 622. By this, apparently they mean that she should have first informed her parents to seek their consent (and had it refused), one of the very requirements she contests. One does not have to comply with a statute in order to challenge its constitutionality.

and although Dr. Zupnick was receiving a substantial income from performing these procedures, we credit his testimony that the threat of prosecution would force him to cease.

We find that Mary Moe, Parents Aid Society, Inc., and Gerald Zupnick have standing, as representative party plaintiffs, and Jane Hunerwadel as intervenor. From the standpoint of their being due and adequate class representatives, we find they have a strong personal interest and are competently and vigorously represented by legal counsel, and we certify this as a valid class action as to all.

Before leaving the question of standing we note that Parents Aid and Dr. Zupnick by hypothesis cannot lawfully, with exceptions too unusual for us to be concerned with, perform abortions upon minors incapable of consenting. Nonetheless, we hold that they do have standing to attack the statute as applied to all minors, at least insofar as it requires the consent of both parents. We find nothing about abortions that requires the minor's interest to be treated differently from other medical and surgical procedures, as to which we find the custom to be to proceed on the consent of one parent.

*Controversy.*

 Defendants contend that there is no "case or controversy" because none of the plaintiffs has been actively, or affirmatively, threatened with criminal proceedings. However, this is not the test. Plaintiffs need not act so as to precipitate their prosecution under a statute they wish to challenge as unconstitutional in order to constitute a case or controversy. Nor must they show that prosecution has been actively or verbally threatened in order to establish that the government's posture is adverse. *See* Doe v. Bolton, ante, 410 U. S. at 188, 93 S.Ct. 739. Rather, we must make a realistic appraisal of the total circumstances to determine whether the prospect of enforcement of the statute is "chimerical," Steffel v.

Thompson, 1974, 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505, or "concrete," Aetna Life Ins. Co. v. Haworth, 1937, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617. *Cf.* Younger v. Harris, 1971, 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669; *Abele*, ante, 452 F.2d at 1125; Montalvo v. Colon, D.P.R., 1974, 377 F.Supp. 1332, 1334 (per curiam). We find that the subject of abortions has excited a great amount of feeling in Massachusetts; that the defendants, as is evident from their activities in this case, are satisfied that the statute is constitutional; that there will be extensive pressure upon them to prosecute in case of a violation, and that it is highly improbable that they would not immediately respond to such pressures. Baird testified that he had been arrested without warning in connection with the Massachusetts birth control statute, socalled, and we believe that public opposition to abortion is more organized and more vocal than was the opposition to birth control. Under all the circumstances we find that plaintiffs had every reason to believe that they had only two alternatives, to continue their current activities and face immediate arrest, or to bring the present suit.

The "controversy" requirement, like the standing requirement, is to assure that there will be a vigorous contest with active participation on both sides by parties immediately interested, as distinguished from parties engaging in theoretical disputes as an intellectual pastime. *See* Roe v. Wade, ante, 410 U. S. at 123, 93 S.Ct. 705; Golden v. Zwickler, 1969, 394 U.S. 103, 108, 89 S. Ct. 956, 22 L.Ed.2d 113; Maryland Cas. Co. v. Pacific Coal & Oil Co., 1941, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826. It is correspondingly requisite that the court's time not be wasted. We find that the present case fits the requirements in both respects, and hold that there is a sufficient controversy.

*The Underlying Facts.*

We were offered nearly three days of testimony. The principal purpose, as we

gather it, was to demonstrate on the one side the need, and on the other the objections; the interests served, and the interests countered, by the statute. In some areas there was considerable disagreement between the experts. We do not propose to resolve those disagreements. Even though in some instances our findings might not correspond with defendants' experts, we may accept their factual evidence for present purposes in cases of conflict because, either way, our ultimate conclusions would be the same. It is to be understood that throughout this opinion, unless the contrary is noted, we are talking about abortions during the first trimester.

There are presently three common methods of performing an abortion; injection of a saline solution; the so-called vacuum method, and a hysterotomy. The first two are performed under local anesthesia. The vacuum procedure, apparently the one generally performed by Dr. Zupnick, requires five to seven minutes. It is followed by minor bleeding and occasional pains, spanning perhaps three to six weeks. There is a possibility of infection and other complications, as with any procedure, and there is a possibility, minor, or very remote, depending on whose testimony is accepted, of subsequent sterility. Plaintiffs' doctors, who had performed a very substantial number of first trimester abortions, gave a very low percentage of complications or "morbidity" in the case of lawful, as distinguished from illicitly performed abortions. Defendants' doctor's considerably higher figure we attribute to the fact that he does not do abortions as such, but only "terminates pregnancy" when there is already some medical necessity. Even he did not suggest any greater risks for minors than for adults.

In addition to such physiological risks, there are possible emotional risks. Abortion is commonly looked upon as offering "instant relief." In many cases this may be so, but in some it may be followed by various feelings of guilt.

We also respect defendants' expert's view that it is undesirable to make too speedy a decision. At the same time we note his opinion that this decision, as the minor reaches the end of the first trimester, has great psychological as well as medical weight, and should be made as soon as possible.

All experts agreed that pregnancy in an unmarried minor is a period of great emotional stress; that support is needed, and that parental support, if forthcoming, is most desirable. Probably most parents are supportive. We are obliged to find, however, that an appreciable number are not, for a variety of reasons. Moreover, as may be the case with Mary Moe's father, parents may seek to control sexual behavior by threats that they do not mean, or would not carry out in the actual eventuality, but which nonetheless serve to destroy intercommunication.

We must find, however, that a significant number of minors who are capable of consenting are unwilling to tell their parents, either because they correctly fear what would happen to themselves, or, although they would expect support from their parents in one sense, they know their parents would under no circumstances consent to the abortion they wish, or, because of their views on illegitimacy and the stigma attaching to unmarried mothers, would attempt to make them enter into a marriage they do not want.

There are also minors who, understandably, do not wish to have their parents know of their condition because of the distress that it would cause them, and the minor's own consequent feelings. While we shall not deal with this aspect further, we note that in a very real sense it precisely fits standard concepts of the right of privacy.

From the standpoint of parents, we believe that most would wish to know of their daughter's pregnancy, and we may assume that most would seek to be supportive. However, we cannot think that all would be. We accept the testimony

of plaintiffs' experienced expert that some parents would insist upon the continuance of the pregnancy simply as a punishment, or to teach a lesson. We might find difficulty in regarding this reaction as other than unusual if we did not recall that the Commonwealth itself argued in Baird v. Eisenstadt, 1 Cir., 1970, 429 F.2d 1398, 1401, aff'd, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349, that the prevention of fornication is so important that it justified withholding birth control devices from unmarried adults, with the resultant risk of pregnancy. The fact that the Court of Appeals expressed shock at this view does not mean it does not exist, but merely illustrates the degrees of variance and the strength of opinions on this subject.

Of unquestionable numerical importance, we cannot overlook the fact that many parents believe with total sincerity that abortion is morally impermissible, either under all circumstances or unless to save the life of the pregnant woman. This leads to the significant contention pressed upon us by defendants as well as by intervenor, that some parents believe that they have separate rights as parents, and that there is a family interest, separate and apart from that of the minor. These interests, which are asserted to be of constitutional proportions, they variously describe as "parents' liberties;" the parents' right to "control," and their right to "promote and preserve the family as an important societal unit." These rights being, by hypothesis, antithetical to the minor's, it may not be unnatural for the minor to feel that she is in trouble enough without having to become subservient to claims of others.

We have not stated all of the factual issues in this difficult area, but we believe we have stated enough to delineate the issues for present purposes. More facts will appear later when relevant.

*The Minor's Consent.*

■ The greatest divergence in the testimony related to the capacity of minors to given an informed consent.[8] At one extreme, Baird testified that in his many years experience he had never met a minor who was incapable, a conclusion supportable only on a hypothesis, which we reject, that an abortion, if not medically contra-indicated, is always the best solution, so that a minor who wants one must be presumed capable. We are also not impressed by the observation in Washington v. Koome, 1975, 84 Wash.2d 901, 530 P.2d 260, which recognized a 16-year old's consent, that "[t]he age of fertility provides a practical minimum age requirement for consent to abortion, reducing the need for a legal one." Fertility marks a physical, not emotional or intellectual maturity, and a "fertile" minor may become pregnant precisely because she lacks the capacity to reason and consent maturely. No expert testified that every minor of any age was able to make a considered decision.[9] Of necessity, there will be factual questions to weigh in each case.

Plaintiffs' experts were of the view that a majority of 16 and 17 year olds are capable. Defendants' experts, although they felt that essentially all are capable at 18, considered the 18th birthday a significant turning point, and would concede only a substantial minority at age 17. Whatever may be the value of conclusive presumptions making the 18th birthday a turning point for such matters as voting, the purchase of liquor, and entering into contracts other than certain contracts for necessaries, *cf.* J. G. Pierce Co. v. Wallace, 1925, 251 Mass. 383, 146 N.E. 658, we can attach

---

**8.** We are not dealing in this case with legislation directed to the legal capacity of minors to consent to a medical or surgical procedure. *Cf.* Younts v. St. Francis Hospital and School of Nursing, Inc., 1970, 205 Kan. 292, 469 P.2d 330, 336–38; Smith v. Seibly, 1967, 72 Wash.2d 16, 431 P.2d 719, 722–24.

For reasons we shall come to, the statute goes far beyond such a principle.

**9.** We find quite credible defendants' expert who testified that at certain periods of their lives adolescents might react maturely one day and immaturely the next.

no such factual magic to that birthday. We may also remark, parenthetically, that it is singular for the state to provide that a minor may consent to intercourse at age 16, Mass.G.L. c. 265, § 23 (statutory rape), but cannot consent to get rid of the product until she is two years older. But whichever experts are correct, it is enough for present purposes that we find that a substantial number of females under the age of 18 are capable of forming a valid consent. Our overall question, accordingly, is whether the state can be permitted to restrain the free exercise of that consent, to the extent that it has endeavored to do so.

We consider first what the statute does not do.

1. The statute does not purport to require simply that parents be notified and given an opportunity to communicate with the minor, her chosen physician, or others. We mention this obvious fact because of the persistence of defendants and intervenor in arguing that the legislature could properly enact such a statute. Whether it could is not before us, and there is no reason for our considering it.

2. The statute does not exclude those capable of forming an intelligent consent, but applies to all minors. The statute's provision calling for the minor's own consent recognizes that at least some minors can consent, but the minor's consent must be supplemented in every case, either by the consent of both parents, or by a court order.

3. The statute does not purport simply to codify what we find to be accepted medical practice in Massachusetts hitherto, namely, that certain medical procedures involving minors require the consent of a parent. This statute creates a special, unique exception by requiring the consent of both parents.

4. The statute does not purport simply to provide a check on the validity of the minor's consent and the wisdom of her decision from the standpoint of her interests alone. Rather, it recognizes and provides rights in both parents, independent of, and hence potentially at variance with, her own personal interests. On being told by the court during argument that this appeared to be the statutory meaning, counsel agreed. It is the Commonwealth's position "that a parent in the decision-making process can consider interests other than the minor's. . . . The concept of liberty . . . embraces parental rights of supervision and control over children, and really what we are dealing with are competing rights of a constitutional dimension." Intervenor took the same position. We agree that this is the clear statutory intent. Whatever may be accorded to the minor by allowing her judicial review "for good cause shown," we do not regard it as meaning that the court should reverse a refusal of consent it finds reasonably made in the parent's interests.

5. As a corollary to the foregoing, the statute is not to be weighed in terms of permissible overbreadth, unavoidably applying to minors in fact capable of consenting because necessary for proper administration or enforcement with respect to minors considered incapable. The legislature made no such determination. Rather, the direct purpose is to encumber the rights of all minors facially coming within its terms.

██ We make this extensive analysis, which we take it all parties are in agreement with,[10] to demonstrate the two basic issues: the minor's personal rights, and the separate rights of the parents.

*The Minor's Rights.*

██ Passing for the moment the question whether there are conflicting rights, there can be no doubt but that a female's constitutional right to an abor-

10. The dissent is seemingly of the opinion that a reviewing Superior Court Judge would consider only the interests of the minor. We find no room in the statute for so limited an interpretation.

tion in the first trimester does not depend upon her calendar age. While the Court in Roe v. Wade, ante, 410 U.S. at 165 n. 67, 93 S.Ct. 705, failed to pass upon whether there were any special rights in the state, or elsewhere, that could be of greater significance when the female is a minor, the Court in no way suggested that a minor lacked personal rights. "[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone," In re Gault, 1967, 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527; see Coe v. Gerstein, S. D.Fla., 1974, 376 F.Supp. 695, 698; Merriken v. Cressman, E.D.Pa., 1973, 364 F.Supp. 913, 918–19; Washington v. Koome, ante, 530 P.2d at 263; Note, the Minor's Right to Abortion and the Requirement of Parental Consent, 1974, 60 Va.L.Rev. 305, 316–19. Cf. In re Winship, 1970, 397 U.S. 358, 365, 90 S.Ct. 1068, 25 L.Ed.2d 368; Stull v. School Board of Western Jr.–Sr. High School, 3 Cir., 1972, 459 F.2d 339, 345. We see no room for dispute. Furthermore, in the case at hand that right cannot be subordinated to the state any more than can be an adult's. We say this because, as previously pointed out, the statute is cast not in terms of protecting the minor, cf. Ginsberg v. New York, 1968, 390 U.S. 629, 638, 88 S.Ct. 1274, 20 L.Ed.2d 195; Prince v. Massachusetts, 1944, 321 U.S. 158, 168, 64 S.Ct. 438, 88 L.Ed. 645, but in recognizing independent rights of parents. In this circumstance the statute does not attain validity vis-a-vis the minor by virtue of her ability (such as it is) to appeal to a Superior Court judge; this is merely a constraint on the assertion of unreasonable claims of her parents. The question comes, accordingly, do parents possess, apart from right to counsel and guide, competing rights of their own?

*The Competing Rights of Parents.*

The importance of the last-mentioned distinction is not to be overlooked. It is not to deny parents all rights if we invalidate this statute. As intervenor herself well illustrated, parents have years in which to teach their children, counsel them, and guide them. We may wonder how much would be accomplished by compulsorily affording a parent an eleventh hour opportunity, if adequate communication had not been established before. And we may wonder, also, whether imposing such burden on the minor would necessarily improve the family relationship. But this, as we have said, is not the statute's aim. The parents not only must be consulted, they are given a veto. Defendants do not like this word. The fact, however, that because of the right of appeal this veto may not be absolute, modifies it only to a degree. So long as parents' independent rights may be enforced, they remain formidable.

Except to assert that such rights exist, defendants and intervenor do little to demonstrate why parents should be granted individual rights independent of the minor's best interests. It is not they who have to bear the child. Once born, the minor, and not they, will be responsible for it in all senses, financially and otherwise.[11] It is difficult to think of any self interest that a parent would have that compares with those significant interests of the pregnant minor.

Turning from discussion to decided authority, the cases cited by defendants and intervenor involving rights of parents uniformly concern situations where the parents' claimed rights are compatible with the minor's, not adverse. Such cases are of no assistance. Of course parents have rights in proper

---

11. If we may take note of a comment made by a defender of such statutes on W. Buckley's Firing Line, Feb. 9, 1975, Southern Educational Communications Ass'n, Publisher, that having refused consent for an abortion the parents "assume a major responsibility to the infant who is going to be born," one may hope this would be so, but it would be naive not to envisage many exceptions. The statute places the burden of all exceptions on the minor.

instances, to act in their children's interests. What is claimed here is something altogether different. But even if it should be found that parents may have rights of a Constitutional dimension vis-a-vis their child that are separate from the child's, we would find that in the present area the individual rights of the minor outweigh the rights of the parents, and must be protected. The single exception to this is Planned Parenthood v. Danforth, (E.D.Mo., 1975), 392 F.Supp. 1362. We do not agree with the majority opinion.

Consequently, the parental consent requirement of Massachusetts General Laws, Chapter 112, Section 12P, is constitutionally invalid. Judgment will be entered permanently enjoining defendants from enforcing Chapter 112, Section 12P, as it relates to parental consent in any fashion. Plaintiffs to have their costs. Attorneys' fees against defendants are denied.

So ordered.

JULIAN, Senior District Judge (dissenting):

I disagree with the decision of the majority. I would hold that the challenged statute[1] is constitutionally valid. It is also my opinion that in these proceedings the defendants and the parents of "Mary Moe," the 16-year-old plaintiff, have been deprived of their legal rights without due process of law.

I shall address the latter issue first.

The minor plaintiff in this case is an unemancipated, unmarried, high-school girl living with her parents and the rest of their family. At the time this action was brought she was pregnant and had been for about eight weeks. Within a matter of hours after the single judge issued a temporary restraining order enjoining the enforcement of the statute, Dr. Zupnick, a plaintiff, performed the abortion on the girl. Her parents were not consulted. They have no knowledge of the girl's pregnancy or of the abortion. They have no knowledge of the pendency of this action. The ma-

---

1. That statute, Mass.G.L. c. 112, § 12P, provides:

"(1) If the mother is less than eighteen years of age and has not married, the consent of both the mother and her parents is required. If one or both of the mother's parents refuse such consent, consent may be obtained by order of a judge of the superior court for good cause shown, after such hearing as he deems necessary. Such a hearing will not require the appointment of a guardian for the mother.

"If one of the parents has died or has deserted his or her family, consent by the remaining parent is sufficient. If both parents have died or have deserted their family, consent of the mother's guardian or other person having duties similar to a guardian, or any person who had assumed the care and custody of the mother is sufficient.

"(2) The commissioner of public health shall prescribe a written form for such consent. Such form shall be signed by the proper person or persons and given to the physician performing the abortion who shall maintain it in his permanent files.

"Nothing in this section shall be · construed as abolishing or limiting any common law rights of any other person or persons relative to consent to the per-

formance of an abortion for purposes of any civil action or any injunctive relief under section twelve R."

If the written informed consent of the proper person or persons has not been delivered to the physician performing the abortion as set forth in § 12P, and if an emergency requiring immediate action does not exist, no abortion may be performed. Mass.G.L. c. 112, § 12N. Any person who willfully violates the provisions of § 12N shall be fined not less than $100 nor more than $2,000. Mass.G.L. c. 112, § 12Q. The statute also allows the attorney general or any person whose consent is required pursuant to § 12P or common law to petition the state's superior court for an order enjoining performance of an abortion that may be performed contrary to the provisions of c. 112, §§ 12I–12Q. Mass.G.L. c. 112, § 12R.

Roe v. Wade, 410 U.S. 113 (1973), at 153–154, 163, 93 S.Ct. 705, 35 L.Ed.2d 147, requires that a woman who consents to an abortion must also obtain the consent of a physician. Mass.G.L. c. 112, § 12P, also requires an additional consent when a minor is to have the abortion—the consent of the minor's parents, and further provides that if the parents do not consent, the consent may be obtained by court order.

jority of the Court denied defendants' motion that the parents be joined as parties to the action. The name "Mary Moe" is a fictitious name. She has withheld from her parents all information concerning her pregnancy and the abortion. She has been permitted by the Court to withhold her name and address and the names and address of her parents from the defendants as well as from the Court itself. The majority went further and ordered the defendants not to make any attempt to discover her identity or the identity of her parents.[2] The majority have thus made it impossible for the defendants to call the parents as witnesses at the trial or to take their depositions. The minor testified at the trial and the majority have made findings of material facts on the basis of her uncorroborated testimony. Some of the findings relate to the parents and reflect adversely upon their performance of their parental duties. The concealment of the identity of the parents precluded the defendants from rebutting the girl's testimony and from impeaching her credibility. They were also precluded from presenting evidence concerning the degree of maturity that the girl had attained[3] and the competence, fitness and willingness of her parents to act as her guardians in this litigation and look after her best interests.[4]

Adjudication of this case significantly affects constitutional, statutory and common-law rights of the parents. "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." Baldwin v. Hale, 68 U.S. 223, 233, 1 Wall. 223, 17 L. Ed. 531 (1863), as quoted approvingly in Goss v. Lopez, 419 U.S. 565, 579, 95 S. Ct. 729, 42 L.Ed.2d 725 (1975).[5] Since the majority have made this a class action,[6] the temporary restraining order issued by a single judge and extended by the majority irreparably abridged not only the rights of the parents of plaintiff Mary Moe, but also the rights of the parents of all unmarried pregnant minors under the age of 18, that is, girls from about 12 years of age through 17, whose daughters have been aborted without any notice to the parents. The decision of the majority deprives the parents of their parental rights without notice or opportunity to be heard concerning the existence or extent of those rights. These parents have thus been deprived of their parental rights without due process of law. Roller v. Holly, 176 U.S. 398, 20 S.Ct. 410, 44 L.Ed. 520 (1900); see Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 123, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968); Federal Rules of Civil Procedure 12(b)(7), 19; 7 Wright & Miller, Federal Practice and Procedure: Civil § 1602 at 20 (1972). A decision entered in violation of the essential require-

2. Appropriate precautions to prevent public disclosure of the minor's identity would have sufficed. There was no need for the Court to suppress disclosure of probable sources of relevant evidence.

3. The majority find as a fact that "Mary Moe is of ample intelligence to, and in fact does, fully understand the nature of this action." The evidence before this Court is insufficient to justify such a finding. Plaintiff minor has not been shown by the evidence to possess a higher degree of intelligence than the average adolescent of her age. Based on the general experience of mankind, judicial notice may be taken that the average adolescent of sixteen does not "fully understand" the difficult substantive issues raised by this action.

4. The courts require a strong case to be made before they will interfere, or permit strangers to interfere, with the parents' guardianship. See, generally, "Readings in the History and System of the Common Law," Pound and Plucknett, 3d ed., 1927, at p. 496.

5. Roller v. Holly, 176 U.S. 398, 409, 20 S.Ct. 410, 414, 44 L.Ed. 520 (1900): "That a man is entitled to some notice before he can be deprived of his liberty or property, is an axiom of the law to which no citation of authority would give additional weight; . . . ."

6. In my view, the majority have failed to comply with the requirements of Rule 23 of the Federal Rules of Civil Procedure relating to class actions.

ments of due process of law is void. Bass v. Hoagland, 172 F.2d 205, 209 (5 Cir.), cert. denied, 338 U.S. 816, 70 S.Ct. 57, 94 L.Ed. 494 (1949); United States v. Manos, 56 F.R.D. 655, 659 (S.D.Ohio, 1972); see Roller v. Holly, *supra*.

The majority have deprived the parents of the minor plaintiff of their parental rights without due process of law. The procedure followed in this case has also effectively deprived the defendants and intervenor of their right to call and examine witnesses before and during trial and to test the veracity of the minor plaintiff as a witness.

In addition to refusing to permit joinder of the parents as parties to this action, the majority have refused to appoint a guardian ad litem for the minor, thus leaving her without the protection of her natural guardians and of a court-appointed guardian.

The majority's stated reason for its failure to appoint a guardian ad litem for the minor is that

> "Her interests in the facial interpretation of and effect of the statute are fully represented by her competent counsel, and to the extent that there may be thought to be any conflicting interests, by the action of competent counsel for the intervening parent."

Counsel for the plaintiffs was never appointed guardian ad litem for the minor plaintiff and never purported to act as her guardian. At no time before or during trial was he ever informed that he was guardian ad litem for the minor plaintiff. Except as to the issue of the constitutionality of the state statute, the record fails to disclose that counsel for the plaintiffs had the slightest concern for the welfare of the minor plaintiff. The record shows that his sole objective was to have the state statute declared unconstitutional for the benefit of the adult and corporate plaintiffs by eliminating it as a legal obstacle to the performance of abortions on minors under the age of 18. The Court should have appointed a guardian ad litem for the minor plaintiff to ensure proper representation of her interests. See Federal Rules of Civil Procedure 17(c).

Counsel for the minor plaintiff and her "class" was also counsel for the other plaintiffs whose real interests conflicted with those of the minors. The plaintiffs other than the minors receive substantial income from the abortions performed on minors and thus have a financial interest in the outcome of this litigation. Parents Aid Society, Inc.,[7] receives fees for abortions which it shares with the abortionist, Zupnick.[8]

---

7. On all the pertinent evidence it is more probable than not that Parents Aid Society, Inc., is Baird's alter ego.

8. Zupnick lives in New York. He commutes to Boston to perform abortions on two days each week. The Boston abortions are not the full extent of his practice, however. Zupnick also performs abortions in New York two days each week. Zupnick's medical practice is limited to performance of first trimester abortions in facilities of Parents Aid Society, Inc., in Boston and New York. Zupnick is paid well, as his testimony shows:

> "Q. Is there a maximum price for an abortion at Parents Aid Society?
> "A. Yes. The abortion fee is on a sliding scale from the patient's ability to pay to a maximum of $150.
> "Q. In the case where $150 is charged, what do you receive in that instance?

> "A. Usually a third.
> "JUDGE FREEDMAN: Is that paid on a monthly basis?
> "The WITNESS: No. It is paid on a daily basis. I am given a check at the end of the day.
> "Q. What was the amount of the last check that you received from Parents Aid Society?
> [An objection is stated and overruled]
> "A. I honestly don't recall the exact figure. I believe it was in the area of $600.
> "Q. You have received checks higher than that amount?
> "A. Higher and lower, yes.
> "Q. Does that constitute reimbursement for two days work?
> "A. That is correct.
> &ast; &ast; &ast; &ast; &ast;
> "JUDGE FREEDMAN: I would be interested, Doctor, in the number of abortions

Baird insists that he does not receive funds from Parents Aid Society, Inc.: "[N]ot one penny has come to me in eleven years." (December 31, 1974, Tr. p. 120.) Baird's wife, however, receives funds from Parents Aid Society, Inc., in Baird's words: "because I was not earning enough money to feed her and the family." (*Id.*)

The plaintiffs, including the minor, were represented by the same counsel. Parents Aid Society, Inc., Zupnick, Baird, and Baird's wife and children, however, directly or indirectly, derive financial advantage from the abortions. The financial interest of those plaintiffs, however, are in conflict with the minor's "very real need . . . to have her own personal rights and interests protected." Noe v. True, 507 F.2d 9, 12 (6 Cir. 1974).

The interests of the minors in this litigation are of a different nature and far more important than the monetary interests of the other plaintiffs. They are in collision and should not have been represented by the same counsel. Advocacy on behalf of the minor should have sought to protect her from possible overreaching on the part of adults such as Baird or Zupnick. No consideration appears to have been given to the possibility that the abortion may have been adverse to her best interests. Counsel made no attempt to determine the emotional impact the abortion might have on her.

The interests of the minor plaintiff were not adequately represented. The Court should not have deprived the minor of the guidance, counsel and care that her parents were under a legal obligation to provide, and might have provided if her condition had not been concealed from them. If the parents had been informed and nevertheless had failed to act, the Court should have assumed the ultimate responsibility for any determination made on behalf of the minor by appointing a guardian ad litem.[9] See Noe v. True, 507 F.2d 9, 11–12 (6 Cir. 1974).

you performed—the percentage of those that incorporate fees of the maximum $150 as opposed to those that are actually free.
"The WITNESS: As I said before, it is not always free or $150. It is on a sliding scale basis. If you are asking me how many patients pay the total of $150 fee—
"JUDGE FREEDMAN: Yes. How many pay no fee on a percentage basis?
The WITNESS: I would say probably about two-thirds pay the $150 fee and probably about 15% are done for free, and then there is a scale in between on the other patients. . . .
　　*　　*　　*　　*　　*
"Q. When the patient walks into the operating room, typically that is the first time she has met you?
"A. Usually, yes.
"JUDGE FREEDMAN: How long does the typical abortion procedure last?
"The WITNESS: The average technical part of the procedure is five to seven minutes."
(December 31, 1974, Tr. pp. 15–17, 28.)

9. In Foe v. Vanderhoof, 389 F.Supp. 947 (D.Colo., 1975), which is relied upon by the majority, the court did not appoint a guardian ad litem. The court found the emancipated minor plaintiff's interests were fully protected by her counsel and social worker. Counsel, however, did not represent conflicting interests. Moreover, the *Vanderhoof* court found that the plaintiff had met with her mother, doctor and social worker to discuss her pregnancy, abortion procedures and the consequences of the decision. The *Vanderhoof* court also appointed an obstetrician and a psychiatrist to examine and counsel the plaintiff. The appointed doctors agreed she should have an abortion. The *Vanderhoof* court thus assumed responsibility for determinations made on the minor's behalf. In contrast with the meticulous procedure in *Vanderhoof*, Mary Moe, for example, had perfunctory contact with the attorneys and abortionist. No professionals were appointed to examine or counsel her prior or subsequent to the issuance of the temporary restraining order or performance of the abortion. The majority's failure to take any precautions for the protection of the minor's best interests is particularly ironic since Mass.G.L. c. 112, § 12P, which the majority strike down, allows recourse to the state court when parental consent is denied. The state court would have been able to protect the minor's best interests as did the *Vanderhoof* court.

The majority find that Mary Moe was competent to make and effectuate the decision to abort. The majority also find there are other unmarried pregnant minors in Massachusetts who have adequate capacity to give a valid and informed consent to an abortion. These findings are not warranted by the evidence.

In order for consent to be informed, a minor must understand the emotional as well as the physical consequences which may follow from an abortion. The testimony of the psychiatrists is unanimous on this point. Tr. of testimony of Dr. Carol Nadelson, assistant professor of psychiatry at Harvard Medical School, December 30, 1974, pp. 118, 127–132; Tr. of testimony of Dr. Raymond C. Yerkes, child psychiatrist, Director of the Child Service at the Greater Lawrence Mental Health Center, January 28, 1975, pp. 50–52. No testimony was offered, however, concerning the emotional consequences the abortion may or will have upon Mary Moe. No testimony was presented concerning Mary Moe's understanding of these consequences or her ability to understand them. In making their findings the majority must necessarily have applied a test of informed consent which looks only to the minor's ability to understand the consent form, surgical procedure and direct physical effects. The majority disregard that aspect of informed consent which requires that a minor must understand the emotional consequences which may follow an abortion.

Parents have rights and responsibilities that inhere in the parent-child relationship and stem from the fact, nature and purpose of parenthood. These rights and responsibilities are not inimical to the minor's rights and welfare. They exist for the benefit of the child and reflect the child's very real need for proper guidance and protection during the child's formative years. The state has a compelling interest in protecting the parental rights and duties against unauthorized intrusion by third persons. The statute under attack expresses this compelling interest.

The liberty guaranteed by the Fourteenth Amendment "denotes . . . the right of the individual . . . to marry, establish a home and bring up children, . . . ." Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). The Constitution guarantees

> "the liberty of parents and guardians to direct the upbringing and education of children under their control. . . . The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."

Pierce v. Society of Sisters, 268 U.S. 510, 534–535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). See Roe v. Wade, 410 U.S. 113, 152–153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944); see also Weinberger v. Wiesenfeld, —— U.S. ——, ——, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). This right and duty of the parents to prepare the child for additional obligations "must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship." Wisconsin v. Yoder, 406 U.S. 205, 233, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15 (1972).

The Commonwealth of Massachusetts recognizes that a child benefits from parental guidance and protection and fully acknowledges the freedom and responsibility of parents to direct the upbringing of their children. Commonwealth v. Brasher, 359 Mass. 550, 270 N.E.2d 389, 394 (1971).[10] Indeed, it is the articulat-

---

10. Mass.G.L. c. 112, § 12P, is one of many state statutes designed to protect the child from her own improvidence and from overreaching by adults by requiring parental consent as a prerequisite to the child's engaging in a specified activity. E. g., Mass.G.L. c. 131, § 14; c. 140, §§ 131, 179; c. 207, § 7; c. 208, § 30; c. 210, § 2; c. 248, § 35; c. 272, § 1.

ed policy of Massachusetts to strengthen and encourage family life for the protection and care of the child. Mass.G.L. c. 28A, § 1; c. 119, § 1.

The question of the constitutionality of statutes requiring parental consent to the abortion has been explicitly left open in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).[11] There is nothing in that opinion or in the opinion in the companion case of Doe v. Bolton, id., 410 U.S. at page 179, 93 S.Ct. 739, that abrogates or erodes the rights and responsibilities of parents. Those decisions do not remove the pregnant, unemancipated minor from the care and custody of her parents. The parents still remain her natural guardians with undiminished responsibility for her welfare.

The State parental consent statute protects an interest which is completely separate from the State's interest in the protection of the pregnant woman's health or the unborn child's life. The statute protects the right of the parents to the liberty guaranteed them by the Fifth and Fourteenth Amendments. The statute protects the family relationship, the right and duty of parents to bring up their child, the right and duty of parents to inculcate moral standards; the statute provides protection for the parents' right and duty to make reasonable decisions, in the first instance, for the control and proper functioning of the family as a harmonious unit. The statute ensures that parents will have the opportunity to guide and counsel their daughter, and play a supportive role during and after the pregnancy.[12]

11. At page 165, n. 67, 93 S.Ct. at page 733, the Court stated: "We need not now decide whether provisions of this kind [provision requiring parental consent] are constitutional."

12. Mrs. Jean Hunerwadel, the intervenor, holds a B.S. in Early Childhood Education and Child Development from St. Joseph's College, West Hartford, Conn. She has worked at the James Jackson Putnam Children's Center Clinic for emotionally disturbed preschool children and as a kindergarten teacher and director of a nursery school. Mrs. Hunerwadel's testimony concerning the role of parents is pertinent and helpful:
"Q. Now, I ask you this, Mrs. Hunerwadel, are there circumstances in which you would consent to an abortion to be performed on one of your daughters were she to be found to be pregnant, unmarried and under age 18?
"A. Yes, there are.
"Q. Tell us what those circumstances would be.
"A. We would like to understand the circumstances which led to her pregnancy, the circumstances in her life. We would like to know about the boy by whom she became pregnant, about her feelings about the pregnancy, her feelings about the baby, her feelings about the boy who would be the father of the child. We would like to be able to make available to her our support and our interest and our care as we have from the time that we have known she was coming to us.

"We would like to be sure that she has available all of the alternatives that are available to her and all of the resources in the community, and we would like the opportunity to have her know that we will continue to support her, and if she should decide, in spite of what we were able to show to her in terms of alternatives and support and how we felt, that she just must have an abortion, we would consent to that; that that would not be the end of our involvement.
"We would also want to be sure that she had a gynecologist-obstetrician whom we felt was professionally skilled, and beyond that, who had the qualities of interest and sensitivity and humanitarianism which we regard to be important in physicians; and we would also want to be sure that the facility that was chosen in which the abortion were to be done was one which had adequate services all around, because we do not regard the situation of unplanned pregnancy to be a separate situation which is begun, ended and then is out of the youngster's life.
"We feel that the youngster, as everybody does, brings feelings of circumstances into the situation and that also circumstances and feelings continue after, whether it is a completed pregnancy or an abortion.
"And we would foresee needing follow-up care for this youngster, psychiatrically, probably, at some time if not immediately.
"So those kinds of decisions would be very important to us to help her to make."
(January 28, 1975, Transcript pp. 77–78.)

The majority attack the statute because it requires the consent of both parents. Parental rights and duties, however, inhere in both parents by reason of their parenthood and are guaranteed equally to both parents by the Constitution. The statute before us recognizes that one parent cannot lawfully usurp the rights and duties of the other, Weinberger v. Wiesenfeld, —— U.S. ——, ——, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975),[13] and requires the consent of both except as otherwise provided in the statute.

Minors, of course, possess constitutional rights. Constitutional rights, however, are not absolute. Their exercise may be made subject to reasonable conditions.[14] The constitutional right of an adult woman to have an abortion, for example, has been conditioned by the Supreme Court upon the concurrence of a physician in her decision. The purpose of the condition is to provide a safeguard against the possibility of a medically inadvisable decision. See Roe v. Wade, 410 U.S. at 153, 93 S.Ct. 705. With respect to minors, the power of the state to limit or regulate the exercise of constitutional rights has been recognized by the Supreme Court. In Ginsberg v. New York, 390 U.S. 629, at page 638, 88 S.Ct. 1274, at page 1280, 20 L.Ed.2d 195 (1968), the Court states:

" . . . [W]e have recognized that even where there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults . . . .' Prince v. Massachusetts, 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645."

And again at page 639, 88 S.Ct. at page 1280:

"The well-being of its children is of course a subject within the State's constitutional power to regulate, and, in our view, two interests justify the limitations in § 484–h upon the availability of sex material to minors under 17, at least if it was rational for the legislature to find that the minors' exposure to such material might be harmful. First of all, constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society. 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state

---

The testimony of each medical expert, whether called by the plaintiffs or defendants, establishes the validity of Mrs. Hunerwadel's position. While the experts differ concerning the necessity for parental consent, each indicated that parental involvement in the abortion decision is helpful, benefits the child, and should be encouraged. Tr. of testimony of Dr. Somers H. Sturgis, emeritus professor in gynecology at Harvard University, Dec. 7, 1974, p. 27, Dec. 30, 1974, pp. 5–6, 8–9, 19; Tr. of testimony of Dr. Jane E. Hodgson, associate professor of obstetrics and gynecology at the University of Minnesota, Dec. 7, 1974, pp. 66–67, Dec. 30, 1974, pp. 75–77, 80–81; Tr. of testimony of Dr. Carol Nadelson, assistant professor of psychiatry at Harvard Medical School, Dec. 30, 1974, pp. 115–116, 119–121, 130; Tr. of testimony of Dr. Jules Rivkind, chairman of the Department of Obstetrics and Gynecology at Mercy Hospital, Pittsburgh, Pa., Jan. 28, 1975, pp. 15–18; Tr. of testimony of Dr. Raymond C. Yerkes, child psychiatrist, Director of the Child Service at the Greater Lawrence Mental Health Center, Jan. 28, 1975, pp. 47–50, 63–64.

13. At page ——, 95 S.Ct. at page 1235: "And a father, no less than a mother, has a constitutionally protected right to the 'companionship, care, custody, and management' of 'the children he has sired and raised, [which] undeniably warrants deference and, absent a powerful countervailing interest, protection.'"

14. "We . . . conclude that the right of personal privacy includes the abortion decision, but that this right is not unqualified and must be considered against important state interests in regulation." Roe v. Wade, 410 U.S. 113, at 154, 93 S.Ct. at 727.

See also United States v. Bisceglia, 420 U.S. 141, 144, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975).

can neither supply nor hinder.' Prince v. Commonwealth of Massachusetts, supra, at 166, 64 S.Ct. [438] at 442."

I find, therefore, no conceivable constitutional objection to legislation providing in the case of a pregnant minor an additional condition designed to make certain that she receive parental or judicial guidance and counselling before having the abortion. The requirement of consent of both parents[15] ensures that both parents will provide counselling and guidance, each according to his or her best judgment. The statute expressly provides that the parents' refusal to consent is not final. The statute expressly gives the state courts the right to make a final determination. If the state courts find that the minor is mature enough to give an informed consent to the abortion and that she has been adequately informed about the nature of an abortion and its probable consequences to her, then we must assume that the courts will enter the necessary order permitting her to exercise her constitutional right to the abortion. There is no basis for a contrary assumption.[16] In the case of an adolescent girl who finds herself in an emotional crisis of this kind it is important to make certain that she receive guidance and support from her parents who normally, more than any other person, have the strongest natural interest in her welfare. In the event that the parents refuse their consent, guidance and support will be provided by the state court judge in his role of parens patriae. The requirement of parental consent makes it necessary that the parents be informed and consulted about the girl's serious problem. The girl's condition would not then be concealed from her parents as has been done in this case with the cooperation of this Court as though her parents, whom we do not know and have not heard, were her natural enemies and not her natural guardians.

Parental rights and duties are recognized and guaranteed by the Constitution as necessary to the welfare of the minor children themselves, as well as of the family of which they are a part. The state has a compelling interest in the protection of these parental rights and duties. The statute is necessary to protect this compelling interest and is narrowly drawn to do just this. The statute is constitutional. Planned Parenthood v. Danforth, 392 F.Supp. 1362 (E.D.Mo.1975), enforcement stayed, 420 U.S. 918, 95 S.Ct. 1111, 43 L.Ed.2d 389 (1975). The statute before us is specifically designed to protect pregnant minors under 18 years of age against their own improvidence due to immaturity of judgment, and against overreaching by others.[17] The enactment of such a statute is a valid exercise of the state's police power and also of its power as parens patriae. Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195

---

15. The majority speculate concerning possible interpretations of the "for good cause shown" language. There is also some doubt whether the statute requires consent of one or both parents. The construction of the statute is a matter of state law. If the majority believe the only constitutional infirmities arise from their interpretation of the statute, the majority should certify questions of state law to the Supreme Judicial Court of Massachusetts pursuant to Rule 3:21 of that court in order to receive a definitive interpretation of the statute. See Hendrickson v. Sears, 495 F.2d 513 (1 Cir. 1974).

16. "Appellee is in truth urging us to base a rule on the assumption that state judges will not be faithful to their constitutional responsibilities. This we refuse to do." Huffman v. Pursue, Ltd., ── U.S. ──, ──, 95 S.Ct. 1200, 1211, 43 L.Ed.2d 482 (1975).

17. Massachusetts, like other states, has many laws, both decisional and statutory, designed to protect minors from their own improvidence and from possible overreaching. See, e. g., Commonwealth v. Nickerson, 87 Mass. (5 Allen) 518 (1863); M.G.L. c. 10, § 29; c. 90, §§ 8, 8A, 8B, 10; c. 106, § 3–207; c. 119; c. 127, § 22; c. 128A, § 10; c. 131, § 14; c. 138, § 34; c. 140, §§ 122, 130, 131, 179, 198; c. 147, § 35; c. 149; c. 191, § 1; c. 207, §§ 7, 9, 24, 25; c. 208, § 30; c. 210, §§ 2, 5A; c. 248, § 35; c. 265, §§ 13B, 22A, 23, 24B; c. 269, §§ 12A, 12B; c. 270, § 6; c. 272, §§ 1, 4, 28, 35A, 58.

(1968); Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

The statute is a proper exercise of constitutional power by the Commonwealth of Massachusetts and is therefore valid. The decision of the majority deprives the defendants and the parents of the minor plaintiff of their legal rights without due process of law.

For these reasons I dissent from the decision of the majority.