Gabrielli, J.
Petitioners challenge, primarily on constitutional grounds, respondent’s requirement that a certificate of termination of pregnancy, a form whose execution is mandated by section 204 of the New York City Health Code, include the name and address of the patient obtaining the abortion. Appellant Dr. Harold Schulman is the director of obstetrics at the Bronx Municipal Hospital and appellant Jane *237 Doe is the fictitious name of a patient on whom Dr. Schulman performed an abortion. At his patient’s behest, Dr. Schulman did not file a pregnancy termination certificate: Petitioners argue that the name requirement violates a woman’s qualified right to an abortion enunciated by the United States Supreme Court in Roe v Wade (410 US 113) and Doe v Bolton (410 US 179); and they claim, additionally, that it violates the right to privacy "connected with the use of an individual’s name.”
Section 204.03 of the New York City Health Code provides that a termination of pregnancy occurring in New York City shall be reported to the Department of Health within 24 hours of the termination, by the person in charge of the hospital in which the abortion occurs. Section 204.05 of the code vests the New York City Board of Health with the authority to prescribe the form and content of the certificate.[1] Finally, and of particularly significant importance here, section 204.07 of the code, as amended by resolution of the Board of Health (pursuant to section 1706 of the New York City Charter), effective November 24, 1973, provides that: "The certificate of termination of pregnancy shall not be subject to subpoena or to inspection by persons other than the Commissioner or authorized personnel of the Department.”
The record indicates that these provisions of the Health Code were enacted in connection with the passage of the State liberal abortion reform law (Penal Law, § 125.05, subd 3; L 1970, ch 127) and prior to the Supreme Court decisions in Roe v Wade (supra) and Doe v Bolton (supra), in order, according to respondent, to safeguard the privacy and sensitivity of women undergoing abortions by differentiating a pregnancy termination certificate from a "fetal death certificate.”
Respondent urges that the reporting requirement was designed to monitor the safety and effectiveness of New York *238 City’s pilot program in legal abortions. The city points out that data from the New York City program was relied upon by the Supreme Court to support its premise that abortions prior to the end of the first trimester produced as low or lower death rates than normal childbirth (see Roe v Wade, supra, p 149, n 44). Two public health experts, Doctors Donna O’Hare and Jean Pakter, submitted important background affidavits showing clearly that the certificates were directed toward the accomplishment of seven public health objectives:
1. Allowing follow-up where complications ensue.
2. Enabling the Department of Health to determine whether orthodox procedures were followed.
3. Enabling the department to determine whether further investigation or regulation is required.
4. Facilitating the collection of public health data as yet nonexistent on the possible adverse effects of an abortion or of multiple abortions on the same woman.
5. Ensuring the efficient compilation of this data and to allow the department to retrieve a particular patient’s record from an abortion service where patients are identified only by name and address.
6. Offering public health counseling on adequate family planning measures as alternative means of birth control to repeated abortions.
7. Ensuring that women who test positive for venereal disease, sickle cell anemia, and RH negative factor which affect the health of any future children receive proper public health counseling and treatment.
Respondent successfully demonstrated that, while a woman’s own doctor is in the position to perform many of these functions, he is unable to acquire the broad statistical sampling of data necessary to the establishment of public health programs and the advancement of medical research. The need for such programs is particularly critical in the case of indigent women who do not have private physicians on whom they may rely for after-care medical advice; rather, these women are admitted as clinic patients without attending physicians. The services provided by the Department of Health may, in fact, be the only means of securing adequate medical care for these women.
It is further claimed by the city that the name requirement insures accountability for proper abortion procedures. Anony *239 mous pregnancy termination certificates would encourage careless and inaccurate reporting, and ultimately destroy accountability.[2] The pregnancy termination certificate enables the Department of Health to ascertain whether proper procedures are being followed in second trimester abortions, an area of permissible State regulation under Roe v Wade (410 US 113, supra), and to determine whether second trimester abortions are being falsely reported as first trimester abortions in order to avoid the stricter limitations governing the former. Moreover, the inclusion of names on the pregnancy termination certificate offers the most practicable means for researchers to retrieve a patient’s hospital records containing detailed information regarding the treatment afforded to the patient.
Those of the majority do not necessarily all agree that each of the city’s articulated objectives is sufficient to sustain this mandatory reporting requirement. This is not critical because all do agree that the reporting requirement with centralized computer recording does enable the city to obtain and to have usefully available current statistical data on the basis of which to discharge the city’s responsibility for effective, up-to-date monitoring of abortion practices as well as to plan for the availability and distribution of services and facilities. Not only is a statistical predicate necessary but any reliable evaluation must include opportunity as well for suitable random inquiry of individuals who have used the services.
In Roe v Wade (supra, p 155) the Supreme Court asserted that governmental regulations limiting fundamental rights may be justified only by a "compelling state interest” and that legislation or regulations affecting these rights must be "narrowly drawn to express only the legitimate state interests at stake.” The court held that there was a qualified right to an abortion inherent in the right to privacy explicitly recognized in Griswold v Connecticut (381 US 479; see, also, Breard v Alexandria, 341 US 622; Skinner v Oklahoma, 316 US 535; Pierce v Society of Sisters, 268 US 510; Meyer v Nebraska, 262 US 390). The right was qualified by the "compelling state interests” in protecting the health of the pregnant woman during the second trimester of pregnancy and that of the fetus *240 at the "stage subsequent to viability”, defined by the court as the beginning of the third trimester (Roe v Wade, supra, p 164). We hold that the inclusion of the patient’s name in the pregnancy termination certificate does not infringe upon this right to an abortion or interfere with a woman’s decision to have an abortion. Rather, the pregnancy termination certificate is precisely tailored and reasonably related to the compelling governmental interest in maternal health attaching during the second trimester of pregnancy. The record is completely devoid of any proof that the name requirement dissuades potential abortion recipients from obtaining abortions in New York City. Petitioners advance only unsubstantiated allegations of subjective chill, from which no actual chilling effect can logically be inferred (cf. Laird v Tatum, 408 US 1, 13-14). The city has adequately insured, and the code so provides, that the information provided by the patient is cloaked with confidentiality and shielded from disclosure to unauthorized persons. Thus, we conclude that there can be no threat, real or otherwise, that the contents of a pregnancy termination certificate will become subject to public disclosure.[3]
In accord with our reasoning is the decision of the three-Judge United States District Court in Planned Parenthood of Cent. Mo. v Danforth (392 F Supp 1362, probable jurisdiction noted 423 US 819). Reviewing reporting requirements similar to those at issue here (in addition to other State regulations governing abortions), the court stated that, "The acquisition of data is essential to the advancement of medical knowledge. These provisions establish reporting procedures for statistical purposes only, and require that the division of health ensure the confidentiality of all information. Nothing in these sections would serve to restrict either the abortion decision itself or the exercise of medical judgment in performing an abortion.” (Planned Parenthood of Cent. Mo. v Danforth, supra, p 1374.) No similar confidentiality safeguard was contained in the sections of the New York State Health Law, governing the reporting of prescriptions for certain controlled drugs, held unconstitutional by the United *241 States District Court in Roe v Ingraham (403 F Supp 931). In that case, too, there was testimony by a psychologist that patients, who were in need of drugs subject to the reporting procedures on account of their medical conditions, would be dissuaded from using them because of the fear of being branded "drug addicts” by the State. Patients and parents of minor patients themselves testified that the procedures inhibited their use of the drugs.
Because of its slight, if any, impact on the abortion decision and procedures employed by physicians for first semester abortions, this case is distinguishable from Word v Poelker (495 F2d 1349, 1351) and Friendship Med. Center v Chicago Bd. of Health (505 F2d 1141, cert den 420 US 997), in which courts invalidated "sweeping regulations of the abortion procedure without regard for the conflicting interests.” (Cf. Younger v Harris, 401 US 37, 51-52.) The regulations challenged herein plainly do not "affect whether and in what manner an abortion will take place” (Friendship Med. Center v Chicago Bd. of Health, supra, p 1151). To the contrary the city has struck a meticulous balance between its public health interests and the constitutionally protected interests delineated in Roe v Wade (supra).
We cannot ignore the fact that New York City’s pilot program pioneered legalized abortions. In light of the shoddy and dangerous conditions under which women were forced to submit to abortion before legalization, New York’s attempt to insure safe conditions, during the period in which abortions are constitutionally subject to its regulation, is laudable. Of course, women of means may not necessarily benefit directly or substantially from New York City public health programs because they presumably receive extensive adequate care and attention from their personal physicians. But, indigent women, not under the watchful eyes of personal attending physicians, may be subjected to improper procedures and inadequate health care following an abortion. The city is not seeking to interfere in the physician-patient relationship in providing counseling for these women; rather, it is seeking to provide such a relationship where none had previously existed.[4]
*242 Petitioners, and a dissenter, incorrectly rely on several United States Supreme Court decisions involving First Amendment questions in seeking to compensate for the utter lack of proof in the record that the challenged name requirement inhibits the abortion decision. In Gooding v Wilson (405 US 518) and Coates v City of Cincinnati (402 US 611), the Supreme Court dealt with facial overbreadth challenges to ordinances governing freedom of expression. There is no authority for extending this doctrine of facial overbreadth beyond the reach of the First Amendment (see Note, The First Amendment Overbreadth Doctrine, 83 Harv L Rev 844, 852). Indeed, the continued applicability of that doctrine beyond the category of statutes regulating "spoken words” is doubtful following the Supreme Court decision in Broadrick v Oklahoma (413 US 601, 615-616; see, also, Civil Serv. Comm, v Letter Carriers, 413 US 548) wherein the Supreme Court articulated the doctrine of "substantial overbreadth”. Moreover, as we observed above, in other decisions invalidating regulations affecting the performance of abortions or the reporting of medical procedures, the record was replete with proof that the statute did impinge upon protected areas of conduct (Word v Poekler, 495 F2d 1349, supra; Friendship Med. Center v Chicago Bd. of Health, 505 F2d 1141, supra; Roe v Ingraham, 403 F Supp 931, supra).
As a subordinate claim, petitioners contend that the name requirement is invalid because of the right to privacy "connected with the use of one’s name.” The cases relied upon by appellants and the dissent in support of this contention are limited in scope to areas of the First Amendment freedom of association and the Fifth Amendment guarantee against self incrimination. The concerns expressed by Justice Powell in California Bankers Assn. v Shultz (416 US 21, 78-79 [concurring opn]) were grounded in First and Fifth Amendment concerns of "associations, and beliefs”. In NAACP v Alabama (357 US 449, 462-463), Shelton v Tucker (364 US 479) and Bates v Little Rock (361 US 516, 524), there was proof on the record that disclosure to the State of the names of members of the NAACP or of a teacher’s associational ties would result in harassment and possible loss of employment. Unlike the situation in these cases, the city’s motive and purpose in gathering the information in pregnancy termination certificates is not *243 suspect. As we noted earlier, the aim of the city’s program in these early years of abortion reform is to assure safe and adequate facilities and procedures in abortions subject to governmental regulation under Roe v Wade (410 US 113, supra).
The right to privacy is not a talisman which may be invoked at will to set aside narrowly tailored governmental regulations which carefully avoid transgression upon constitutionally protected areas of decision making. Both petitioners and the dissenters manifest a misunderstanding of the scope of the right to privacy as articulated by the United States Supreme Court. Heretofore, the right has been construed to envelop (1) decision making in one’s personal life (Roe v Wade, 410 US 113 supra; Eisenstadt v Baird, 405 US 438, supra; Loving v Virginia, 388 US 1; Griswold v Connecticut, 381 US 479, supra; Skinner v Oklahoma, 316 US 535, supra) and (2) expectations of freedom from governmental intrusion into places where one’s personal life is conducted (Griswold v Connecticut, supra; Stanley v Georgia, 394 US 557; Katz v United States, 389 US 347, 351-353 [decided on Fourth Amendment grounds]; see, also, Paris Adult Theatre I v Slaton, 413 US 49, 65-67). Courts have generally not found that the privacy interest extends to situations in which the government gathers personal information for legitimate purposes. (See Note, On Privacy: Constitutional Protection for Personal Liberty, 48 NYU L Rev 670, 770-772; Gross, The Concept of Privacy, 42 NYU L Rev 34, 42.)[5] Having concluded that the regulation here is narrowly designed to effectuate a legitimate State interest, we see no compelling reason to extend the right to privacy beyond its recognized boundaries in this case.
Merely because the termination of pregnancy certificate may not be the only means available to the city to monitor abortion care, if such be the case, or is not as effective as appellants would prefer, does not invalidate it, when there is no interference with the right to privacy. The State is not *244 limited in the means it may choose to advance valid State concerns to methods which Judges deem efficacious. It suffices that the means chosen do not "sweep unnecessarily broadly” so as to infringe upon constitutional rights, and are rationally related to the "compelling state interest” asserted (Roe v Wade, supra, pp 155, 164; NAACP v Alabama, 377 US 288, 307; cf. Cleveland Bd. of Educ. v LaFleur, 414 US 632, 643-644). The city has satisfactorily demonstrated that the pregnancy termination certificate and the name requirement, an integral part thereof, provide significant assistance in (1) assuring proper compliance with abortion procedures during the second trimester, (2) providing medical assistance to abortion patients and (3) advancing medical research in the abortion field.
Despite the legitimate ends of the city’s inquiry here, we are not insensitive to the dangers posed by modern computer technology. Present day computerized information storage and retrieval systems may pose a significant threat to the constitutionally protected right to privacy (see Fried, Privacy, 77 Yale LJ 475, 489-493; Note, Privacy and Efficient Government: Proposals for a National Data Center, 82 Harv L Rev 400). This is especially true when governmental entities are permitted to indiscriminately seek and compile information concerning individuals for impermissible or vaguely articulated reasons (see NAACP v Alabama, 377 US 288, supra; Shelton v Tucker, 364 US 479; Schware v Board of Bar Examiners, 353 US 232). In the instant case, however, the regulation is designed to provide information for narrow, well-defined and laudable governmental ends. Protection is afforded to the individual by the confidentiality provision of section 204.07 of the New York City Health Code. There is no allegation that information is permitted to leak from the system or that it is made available to other governmental agencies for illegitimate purposes. Contrary to petitioners’ assertion, abortion is not singled out for a centralized data reporting requirement. The General Administration Manual of the Department of Health indicates that confidential records are maintained in the areas of birth defects, cancer cases, tuberculosis cases and reports of venereal disease, among others. We trust, of course, that when the need for the information contained in a pregnancy termination certificate ceases, the city will discontinue its culling and storage of information concerning abortions. At the present time, however, we believe that it has been clearly demon *245 strated that the information on the certificate, including the name requirement, serves a valid objective and is rationally related and narrowly tailored to the compelling State interest in maternal health during the second trimester of pregnancy.
Accordingly, the order of the Appellate Division should be affirmed.

. Appellant’s preliminary challenge, that the inclusion of names is an abuse of discretion and a violation of the physician-patient privilege in CPLR 4504, must be rejected. Section 204 of the New York City Health Code confers upon the Board of Health the discretion to prescribe the content of pregnancy termination certificates. As long as the content of the certificates is rationally related to a valid State interest, the board has not abused its discretion. As we demonstrate below, the State’s interest here is "compelling” and the name requirement rationally related thereto. Secondly, since the physician-patient privilege is wholly a creature of statute, unknown to the common law, it may be abrogated legislatively. Such is the case here since the Board of Health has been recognized by the Legislature as the sole legislative authority in the field of health regulation in the City of New York (see Grossman v Baumgartner, 17 NY2d 345, 351; New York City Charter, § 1706).

. Respondent estimates that 500,000 legal abortions are performed in New York City hospitals. This figure attests to the onerous burden upon the city to insure adequate medical care for the recipients of these abortions. Electronic data storage may be the most practical means to monitor the standard of care provided.

. We deem irrelevant one dissenter’s allusion to numerous decisions in the abortion area where litigants’ identities are concealed by "protective pseudonyms” (dissenting opn, p 254, n 2). In those cases, without such protection, litigants’ names would of necessity become public knowledge upon publication of the decisions in the press or the official reporters.

. We consider the intimations of one dissenter, relying upon Self v Weinberger (372 F Supp 1196) and related cases, an unfair characterization of the city’s aims and the effect of the regulation challenged. The inference that the city is using the pregnancy termination certificate to advise women against abortions for moral, as *242 opposed to medical, reasons or to threaten denial of public welfare benefits to indigent women is wholly unsubstantiated and unwarranted.

. Protection against disclosure of facts concerning an individual’s personal life has been provided by the tort law of individual States. (See Prosser, Torts [4th ed], § 117; Civil Rights Law, §§ 50, 51; Warren and Brandéis, The Right to Privacy, 4 Harv L Rev 193; cf. Katz v United States, 389 US 347, 350-351, supra.) Some commentators have urged the extension of the right to include control of information over oneself (see, e.g., Fried, Privacy, 77 Yale LJ 475; Parker, A Definition of Privacy, 27 Rutgers L Rev 275).