Fuchsberg, J.
(dissenting). I most respectfully dissent. In my view, the challenged regulations constitute an impermissible interference with appellant’s Federal and State constitutional rights to freedom of speech. That violation distinguishes the case from those which involve merely economic regulation by the State of commercial activities within its borders. As the *372 Supreme Court has noted in North Dakota Pharmacy Bd. v Snyder’s Stores (414 US 156, 164-165): " 'This Court beginning at least as early as 1934, when the Nebbia case [Nebbia v New York, 291 US 502] was decided, has steadily rejected the due process philosphy enunciated in the Adair-Coppage line of cases [Adair v United States, 208 US 161; Coppage v Kansas, 236 US 1]. In doing so it has consciously returned closer and closer to the earlier constitutional principle that states have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some speciAc federal constitutional prohibition, or some valid federal law’ ” (emphasis added).
I believe that the regulation before us does in fact "run afoul” of the First Amendment to the Constitution and must therefore be measured by the more stringent test which that amendment requires (see People v Taub, 37 NY 2d 530). In rejecting the appellant pharmacist’s First Amendment challenge based on his right to speak, the majority cites Pittsburgh Press Co. v Human Relations Comm. (413 US 376) and Valentine v Chrestensen (316 US 52). It further states that it does not find the rationale of these cases vitiated by the Supreme Court’s recent holding in Bigelow v Virginia (421 US 809), a case upholding the right to advertise abortion referral services. But it would appear to me that the applicability of these two cases to the situation now before us has been cast into serious doubt by that decision.
The Valentine case, which involved handbilling to advertise a submarine available to the public for viewing for a fee, did indeed establish the premise that speech directed solely to an offer to do business was not protected under the First Amendment. In Bigelow (p 819), however, the court characterized that earlier holding as limited to the "reasonable regulation of the manner in which commercial advertising could be distributed” (emphasis added). It went on to note, with approval, that Justices Douglas and Brennan, in intervening cases, had characterized Valentine thusly:
" 'The ruling was casual, almost offhand. And it has not survived reflection.’ ” (421 US, at p 820, n 6, citing Cammarano v United States, 358 US 498, 514 [Douglas, J., concurring].)
" 'There is some doubt concerning whether the "commercial speech” distinction announced in Valentine v. Chrestensen *373 . . . retains continuing validity.’ ” (421 US, at p 820, n 6, citing Lehman v City of Shaker Hgts., 418 US 298, 314, n 6 [Brennan, J., dissenting, joined by Stewart, J., Marshall, J., and Powell, J.].)
Moreover, the court in Bigelow redefined its Pittsburgh Press Co. holding as well. Acknowledging that it had there made at least a passing reference to Valentine, when it commented that advertisements for jobs which were classified by sex were still only offers of employment, Bigelow explained that the essential basis for the Pittsburgh holding was a refusal to extend First Amendment protection to editorial judgments as to where advertisements should be placed when such judgments aided and abetted employers in wholly illegal sex discrimination. (421 US, at p 821.)
In contrast, the Bigelow opinion referred favorably to the decision in New York Times Co. v Sullivan (376 US 254), where it was held that advertisements containing matter of general public interest were entitled to protection under the First Amendment. More significantly, Bigelow indicated an unwillingness to limit notions of what may interest the public to purely or obviously political matter. (See, also, Note, The Commercial Speech Doctrine: The First Amendment At A Discount, 41 Brooklyn L Rev 60, 86-90.)
That is not to say that the Bigelow decision interdicts all State regulation of advertising. After indicating that it intended to be consistent with its prior decisions under the due process cases, where regulation of the business aspects, rather than speech aspects, of commercial endeavors was involved (421 US, at p 825, n 10), it added that broadcasting and speech which also involved such conduct as handbilling or picketing were still vulnerable to more regulation than is pure speech used in the commercial context. The court also reaffirmed States’ right to control advertising when it touches upon matters which a State considers illegal or in the regulation of which it has a legitimate interest (at p 825).
It is this last ruling which needs to be considered in applying Bigelow to the case now before us. Especially pertinent is the following language: "Advertising, like all public expression, may be subject to reasonable regulation that serves a legitimate public interest. See Pittsburgh Press Co. v. Human Rel. Comm’n, supra; Lehman v. City of Shaker Heights, 418 U. S. 298 (1974). To the extent that commercial activity is subject to regulation, the relationship of speech to that activ *374 ity may be one factor, among others, to be considered in weighing the First Amendment interest against the governmental interest alleged. Advertising is not thereby stripped of all First Amendment protection.” (421 US, at p 826.)
Pittsburgh involved illegal discrimination. Lehman involved the right of a city to permit commercial advertisements on its transit vehicles while banning political advertisements; the city’s right to do so was upheld on the ground that, since the commercial purveyor was also a political entity, a city, its need to protect citizens from political advertisements which might be placed on vehicles out of favoritism or corruption was a valid State need. In its "note 11” the court listed additional cases in which First Amendment rights were upheld and which make clear that the test of regulations in this context is a stringent one.
From the court’s citations as well as its discussion of the Pittsburgh and the New York Times cases, it seems clear that States may encompass the speech aspects of commercial activities within their regulations only when State interests meet a test of real necessity, not merely a rational basis test.
The involvement of the First Amendment in a State regulation, whether commercial or otherwise, inevitably brings with it a test more demanding than the rational basis test. It is surprising that the majority finds this notion unsupportable. The very distinction with which I began here, so clearly made in the above-cited passage from the North Dakota case, supports the applicability of the more stringent test whenever a State regulation "runs afoul” of a specific prohibition contained in the Constitution. The Bigelow court’s citation to the North Dakota line of cases, in pointing out the distinction between purely economic regulation and that which touches on the First Amendment, lends further support to that proposition.
It seems to me, rather, that, on analysis, the difference in our views centers on the question of where the court, in Bigelow, has drawn the line between what it will call a First Amendment involvement and what it will not. The majority appears to read Bigelow to say that speech directed toward an offer of a product or service for sale at a price is still not protected, while speech in an advertisement of political views is. But that was the Valentine holding, and Bigelow plainly disavowed Valentine. Bigelow’s point is that speech is speech and the First Amendment applies to it; its protected status is *375 no longer to be determined simply on the basis of whether it is commercial or noncommercial.
Of course Bigelow acknowledges that there are areas in whose regulation a State’s interest is so great that it is permitted to override the constitutional protections. It is interesting to note, however, that the Supreme Court’s choice of citations to illustrate this premise involved such conduct as racial discrimination in housing, sex discrimination in employment, and corruption in government (in addition to cases already discussed see 421 US, at p 825, n 10, par 1).
Assuredly, both the ethics of the pharmaceutical profession and the health of the public are areas in which the State may regulate. But, as this court has had occasion to note elsewhere, the fact that a State has an interest in an area does not, in and of itself, mean that any attempt to regulate, no matter how overbroad or unnecessary, is permissible (see Matter of Schulman v New York City Health & Hosps. Corp., 38 NY2d 234 [majority and dissenting opns]; see, also, Eisenstadt v Baird, 405 US 438, 463-464; Griswold v Connecticut, 381 US 479, 485).
Indeed, the fact that Bigelow itself involved advertisements for a New York abortion referral service ought to deal the coup de grace to argument that any regulation of advertising of drug prices by pharmacists automatically falls within the permissible area left by that decision. Surely there is no more regulated area than medical practice in general and abortion in particular (see Matter of Schulman v New York City Health & Hosps. Corp., supra). Yet the advertisement in Bigelow was protected and upheld. The court noted that the public had a strong interest in its informative content and that an advertisement which informed the public of the existence of a perfectly legal medical service was not within the area of a State’s legitimate interest in medical practice or public health.
The public has a strong interest in easy access to information about the cost of prescription drugs, a necessity which it must, in any event, purchase (see Virginia State Bd. of Pharmacy v Virginia Citizens Consumer Council, 373 F Supp 683, probable jurisdiction noted 420 US 971, and see the appendix to brief for appellees before the Supreme Court in the same case). It also has an obvious interest in obtaining such drugs at the lowest possible cost. The appellant pharmacist, like the abortion service advertiser in Bigelow, may assert these inter *376 ests as they have bearing on his own freedom of speech; his interests are intertwined with the public’s.
I find it inescapable that before the State may prevent speech of the kind involved here it must demonstrate that such a regulation is necessary. I do not believe that it has met that burden. Indeed, its own statutes do not even require the sort of regulation which the board adopted here. Significantly, in another case decided on the same day as was Bigelow, (Goldfarb v Virginia State Bar, 421 US 773), the Supreme Court struck down regulations providing for a minimum fee schedule for lawyers counseling clients who seek to buy homes. The court observed that the challenged regulations were not required by State law, and went on to hold that, in any event, protection of ethical standards in a profession could not justify such anticompetitive acts. While the decision is based on antitrust law and not on the First Amendment, it is most relevant here, for it calls into question the concept that the professions may, under color of State law, take steps against the public’s economic interest in the name of ethical regulation. Here, despite the public’s need both for information and for reasonable pricing of prescription drugs, the regulation, in order to prevent abuses in advertising, banned all advertising. Such means are impermissively overbroad.
Accordingly, I would find the regulations in issue invalid.
Chief Judge Breitel and Judges Jasen, Jones and Wachtler concur with Judge Gabrielli; Judge Fuchsberg dissents and vote's to reverse in a separate opinion; Judge Cooke taking no part.
Order affirmed, with costs.