Fuchsberg, J.
(dissenting). This appeal from a conviction for possession in one’s own home and for one’s own use of plants containing less than one ounce of marihuana puts the right to privacy to the test in a contemporary factual setting. Also at stake are rights instinct in the basic precepts of due process and equal protection.
The events which here call for the invocation of these fundamental principles are not controverted. On March 31, 1977, while the defendant, Dr. Martin Shepard, was away on vacation, the police made their way into his home in the Town of Southampton on Long Island, where they seized a number of potted marihuana plants, which it is conceded contained an aggregate weight of less than nine tenths of one ounce of marihuana. It is likewise agreed that the plants were cultivated for the doctor’s personal use alone. Prosecuted on the reduced charge of having violated former section 220.03 of the Penal Law, under which possession of marihuana was a misdemeanor,[1] Dr. Shepard elected to waive objection to the legality of the search and seizure and instead forthrightly moved head-on to dismiss the information on the substantive ground that, as applied to himself as a competent adult, the statute runs counter to our Federal and State Constitutions.[2] After a hearing before a Southampton Town Court Justice on the nature and extent of the physical and psychiatric effects of marihuana, the motion to dismiss was denied and, on the *650 factual stipulations heretofore recited, the defendant was found guilty and fined $100. This appeal is from an order of the Appellate Term affirming the judgment of conviction.
Defendant agrees that the State, in the exercise of its police power, has a rightful and salutary concern for its people’s safety, health and welfare. But he maintains that our Federal and State Constitutions, and indeed the very philosophy on which our system of government rests, puts a check on these powers when they are used to needlessly and arbitrarily restrain individuals from making personal decisions on fundamental private matters that do not directly or materially affect others. For the reasons that follow, I am persuaded that there indeed has been an impermissible imposition on the privacy of the defendant, that the statute as applied here is unconstitutional and that, consequently, the conviction must fall.
I start with a few words about the right to privacy, that integral and indivisible ingredient of liberty and personality which has been characterized as "ground enough to deserve the tribute that it is the most comprehensive of rights and the most valued” (Hufstedler, Directions and Misdirections of a Constitutional Right of Privacy, 26 Record of the Association of the Bar of the City of New York 546, 550-551). Though slow and gradual in its articulation, perhaps because it is implicit in the Constitution as a whole rather than explicit in any one of its parts alone, it has come to play an increasingly powerful and pervasive role in the protection of personal autonomy, i.e., the making of "choices affecting an individual’s personal life”, against the ever more powerful forces of growing government (see Gunther, Cases and Materials on Constitutional Law [9th ed, 1975], p 655; Ravin v State, 537 P2d 494, 504 [Alaska] [possession of marihuana]; Roe v Wade, 410 US 113 [right of unmarried woman to terminate her pregnancy]; Eisenstadt v Baird, 405 US 438 [right of unmarried persons to use contraceptives]; Stanley v Georgia, 394 US 557 [right to possess obscene materials in one’s home]; Griswold v Connecticut, 381 US 479 [right of married persons to use contraceptives]).
Allied with the over-all concept of privacy, and reinforcing it in the present case, is the special place our homes have long enjoyed in the jurisprudential order of things. Only the other week, though in a Fourth Amendment context, the Supreme Court reminded us that "[t]he zealous and frequent repetition of the adage that 'a man’s house is his castle,’ made it *651 abundantly clear that both in England and in the Colonies 'the freedom of one’s house’ was one of the most vital elements of English liberty”. Remarkably, the court also thought it fit to quote from Semayne’s Case (5 Co Rep 91a; 77 Eng Rep 194, 195 [KB, 1603]), which regarded the home not only as its owner’s refuge " 'against injury and violence’ ” but also " 'for his repose’ ” (Payton v New York, 445 US 573, 596, n 44). In thus emphasizing that one’s residence is a bastion of privacy, the court was doing no more than reiterating what it has said in varied contexts, as, for instance, in Stanley v Georgia (supra, at pp 564-565), where, after recognizing that under Roth v United States (354 US 476, 485) "obscenity is not within the area of constitutionally protected speech or press”, the court made the point that the right of access to ideas and information takes on an added dimension when exercised in one’s dwelling place and that "Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one’s own home.” (See, also, Paris Adult Theatre I v Slaton, 413 US 49; United States v Orito, 413 US 139, 142-143; United States v Reidel, 402 US 351; Powell v Texas, 392 US 514, 532 [intoxication in the home vis-á-vis intoxication in public].)
Put more broadly, "even the states, which possess a general police power not granted the Congress, cannot in the name of morality infringe the rights to privacy and freedom of association in the home” (Moreno v United States Dept. of Agric., 345 F Supp 310, 314, affd sub nom. United States Dept. of Agric, v Moreno, 413 US 528). It seems obvious then that the sweep of the rights so delineated necessarily rules out power to discard them for no better reason than the exercise of the police power in circumstances that serve no more than a rational purpose.
Surely, much stronger justification — be it a test fashioned in terms of compelling interest, if not of utter necessity, or, at least, one close and substantial — would be required to impinge on "the development and expression of one’s intellect, interests, tastes and personality” (Doe v Bolton, 410 US 179, 211 [Douglas, J., concurring]; see, also, Matter of Schulman v New York City Health & Hosps. Corp., 38 NY2d 234, 250 [my dissent]). Limiting legislation • must therefore be narrowly drawn, even if thereby rendered somewhat less efficient (NAACP v Alabama, 377 US 288, 307; Shelton v Tucker, 364 US 479, 488; see, also, Reed v Reed, 404 US 71). And, were the *652 Federal Constitution less demanding, I believe our State Constitution should be read to fill the gap (see Matter of Malpica-Orsini, 36 NY2d 568, 591 [my dissent]; Cooper v Morin, 49 NY2d 69, 78-82; Sharrock v Dell Buick-Cadillac, 45 NY2d 152, 159-161; Oregon v Hass, 420 US 714; Cooper v California, 386 US 58; Lego v Twomey, 404 US 477; Barker v Wingo, 407 US 514). So judged, in balancing the rights infringed, on the one hand, against the State’s interest in the proscription effected by the statute, on the other, it appears to me that this test has not been met, to say which, our courts may not "[shirk] the duty or [fear] the peril” (Cardozo, The Nature of the Judicial Process [Yale U Press, 1921, p 135]).
I start my own analysis by assuming that the State has a legitmate interest in deterring the possession and sale of marihuana in order to avoid whatever harm that substance may be thought to be capable of inflicting on the public, a hypothesis which the defendant does not question for the purpose of his appeal. Even so, it cannot be doubted that the enforcement of the statute in the conceded circumstances of this case would not advance the goal of deterrence to any meaningful extent. These circumstances — that defendant is a competent adult, rather than an impressionable child; that the plants were confined to his home and so were not available as an example or encouragement to others; that the quantity of forbidden fruit they contained was too little to provide proof of an intent to distribute or commercialize its product; and that the implicated substance was not in the nature of narcotics, firearms, stolen goods[3] or other objects the private possession and use of which even in the home might present some danger to the public — all certify that, when measured by the degree of judicial scrutiny which the statute must withstand, its enforcement in this case lacks the real and substantial relation to the achievement of its aim necessary for it to satisfy the demands of due process.
Moreover, since the activity the State seeks to curtail by criminal sanction must be one detrimentally affecting public health, safety, welfare or morals, the sociological and scientific knowledge of the effects of marihuana and attempts to control *653 its use is relevant and appropriate for analysis. For instance, as the record indicates, all empirical studies undertaken in States which have decriminalized its possession in recent years have concluded that laws such as the one before us now have almost no deterrent effect. Three States — Maine, California and Oregon — have conducted such surveys. The reports of each make two points: first, usage is not significantly affected by the prohibition laws, and second, usage can be deterred more effectively through education (Evaluation of the Decriminalization of Marijuana in Maine — 1978; A First Report of the Impact of California’s New Marijuana Law; State of Oregon, Survey of Marijuana Use and Attitudes).
These studies, summarized in Marijuana: A Study of State Policies and Penalties (National Governor’s Conference, Center for Policy Research and Analysis [1977]), revealed that usage patterns overall are unaltered (and in some instances decreased) by decriminalization. Their findings are also consistent with the recent Seventh Annual Report to the United States Congress submitted by the National Institute on Drug Abuse in 1979. Similar conclusions were arrived at in recent years by the New Jersey Drug Study Commission when, examining the other side of the coin, it advised its Legislature that "criminalizing marijuana use in New Jersey has failed to act as an effective deterrent and has engendered various social adversity” (Governor’s Report, Oct., 1974, at p 252). Moreover, in urging the passage of the so-called Marihuana Reform Act of 1977 (L 1977, ch 360), which has now decriminalized private possession of small quantities of marihuana (n 1, supra), our own State Assembly Committee on Codes, curiously in the face of the majority and concurring opinions, acknowledged that "the scientific evidence clearly shows no significant harm —or no harm at all — from marijuana use” (Committee on Codes, Memorandum in Support of Assembly Bill 10-D [undated]). To say the least, these hardly demonstrate either a danger to public health or morals or an efficacy of the statutory design sufficient to permit this exercise of the State’s paternalistic power to overwhelm the privacy interest of an adult, particularly one who is neither physically nor mentally incapable of managing his personal affairs (see, generally, Rawls, A Theory of Justice, 248-250; Dworkin, Paternalism, Morality and the Law 107 [Wasserstrom ed]).
This is not to say that opinion on the effect of marihuana is undivided. Marihuana has been in common, even therapeutic, *654 use and, correspondingly, the subject of intense study over many decades and, to a lesser extent, for centuries. Not unexpectedly, then, it has its detractors — and I do not question their competency or their sincerity — but so do other ingestants such as tobacco and alcohol and aspirin and fatty foods and sugar and salt (comparison with which is, in part, the basis for defendant’s equal protection argument). The extant literature, however, proves that, after prolonged and passionate public debate, the almost universal weight of worldwide authority, sparked by nearly all the hard evidence, agrees that the moderate use of marihuana is less harmful for example, than alcohol or tobacco; that there is no causal connection between the smoking of marihuana and the commission of criminal or violent acts; that an overdose death is impossible; that it is not addictive; that there are no withdrawal symptoms; that it causes no brain, lung or psychiatric damage; that the theory that its use predisposes one to the use of hard drugs is a myth; and that its consumption does not cause a hazard to public safety. All of which is not a peal of praise for marihuana; it merely notes the overwhelming weight of scientific knowledge.
A small sampling of the literature from which these conclusions are drawn are the Mayor’s committee’s report entitled The Marijuana Problem in the City of New York (Siller, Marijuana Smoking in Panama, The Military Surgeon, 274, 278; Psychiatric Aspects of Marihuana Intoxication, 99 American Journal of Psychiatry, 249-251; Goodman and Gilman, Pharmacological Basis of Therapeutics, 300; Grinspoon, Marihuana Reconsidered; British Advisory Committee on Drug Dependence, Cannabis [1968]; Marihuana: A Signal of Misunderstanding, published by National Comm on Marihuana and Drug Abuse [Shatter Report]; Report of Canadian Comm of Inquiry on the Non-Medical Use of Drugs [Le Dain Report]; India Hemp Drugs Comm, Marihuana [Jefferson Pub Co ed, 1969]).
Withal, the concurrer’s rhetoric to the contary notwithstanding, I do not overlook the doubts introduced by those, though far fewer in number, whose position is at odds with the ones I have already recorded and whose arguments could readily be quoted in opposition. Nor do I disregard the experience of life about us, for what we know as men need not be forgotten as Judges. Included, of course, are the social disarray and, maybe worse, the disrespect for law that have come *655 in the train of what many regard as unfair and unwarranted prosecutions which accomplish little more than to harass and stigmatize their targets (Kaplan, Marijuana, New Prohibition, supra).*
In the end, the issue here most certainly is not, as the majority and concurring opinions would have it appear, whether the State may regulate the distribution and use of marihuana generally.[4]
[5] Rather, it is whether, when, after all this time, the best the State can claim is that the facts are, and perhaps always will be, less than conclusive, it nevertheless may invade the sanctuary that is Dr. Shepard’s home and dictate his right to there possess and use marihuana, tobacco or, for that matter, cholestrol-making apple pie. Should the fact that the substance he would consume is marihuana make the difference, particularly when the possible damage is so heavily outweighed by the individual’s right to pursue his private aspirations in peace? I think not. Not in a country where, though the government has its sphere, so does each American, and where, to keep that of the individual entire, the Constitution and the courts will guard it from unreasonable and arbitrary restrictions by even the government, including, of course, the Legislature, itself.
Under these standards the State has failed to demonstrate a police power interest great enough to override Dr. Shepard’s right of privacy. Former section 220.03 of the Penal Law should therefore be declared unconstitutional as applied, the order of the Appellate Term reversed, the fine remitted and the information dismissed. By such a decision we would vindicate no less than what Justice Brandéis called "the most comprehensive of rights and the right most valued by civilized men” — "the right to be left alone” (Olmstead v United States, 277 US 438, 478).
*656 Chief Judge Cooke and Judges Jasen, Jones, Wachtler and Meyer concur in Per Curiam opinion; Judge Gabrielli concurs in a separate opinion; Judge Fuchsberg dissents and votes to reverse in another opinion.
Order affirmed.

. Present section 220.03 of the Penal Law speaks only in terms of "controlled substance”, defined in subdivision 5 of section 220.00 to exclude marihuana. This reflects the adoption of the Marihuana Reform Act of 1977 (L 1977, ch 360) which "decriminalized” possession of marihuana (see Penal Law, § 221.05).

. Defendant claims that, in some measure at least, the First, Third, Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments of the United States Constitution and their counterparts at the State level are implicated.

. Stanley v Georgia (394 US 557, 568, n 11, supra) lists these exceptions to items which may be possessed with impunity in the privacy of the home. Marihuana, whose active ingredient is known as tetrahydrocannabinol, is not a narcotic (see Soler, Of Cannabis and the Courts: A Critical Examination of Statutory Marijuana Prohibitions, 6 Conn L Rev 601, 696-697).

. Illustratively, Dr. Lester Greenspoon, Director of Psychiatry (Research) of the Massachusetts Mental Health Center and a professor of psychiatry at the Harvard Medical School, in an affidavit received at the trial of this case, pointed out not only the well-known fact that marihuana is used by a wide cross section of Americans "including college students, professional and business leaders”, but that a recent survey indicated that 70% of Harvard medical students and a significant percentage of its faculty used it without any deleterious effect on their ability to function normally and productively in our society.

. It is interesting to note that when this court upheld the so-called "Rockefeller drug laws”, which pertain to hard drugs, we anticipated that cases might arise in which otherwise permissible sanctions would not be constitutional as applied (see People v Broadie, 37 NY2d 100, 119).